# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 09-507

**WILMA YOUNG BAKER, ET AL.**

**VERSUS**

**JOHN BURR BAKER, JR., ET AL.**

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-662-06
HONORABLE CRAIG STEVE GUNNELL, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Oswald A. Decuir, Michael G. Sullivan, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**John Charles Anderson**
**Anderson Law Firm, LLC**
**P. O. Box 82982**
**Baton Rouge, LA 70884-2982**
**(225) 292-8176**
**Counsel for Defendants/Appellants:**
**John Burr Baker, Jr.**
**Alta Baker**

**Jude Christopher Bursavich**
**Breazeale, Sachse & Wilson**
**P.O. Box 3197**
**Baton Rouge, LA 70821-3197**
**(225) 387-4000**
**Counsel for Plaintiffs/Appellees:**
**Wilma Young Baker**
**Succession of John Burr Baker, Sr.**

**Danielle M. Ross**
**Sessions, Fishman, Nathan & Israel, LLP**
**201 St. Charles Ave., # 3500**
**New Orleans, LA 70170-3500**
**(504) 582-1500**
**Counsel for Defendants/Appellants:**
**John Burr Baker, Jr.**
**Alta Baker**

**GREMILLION, Judge**.

The defendants, John Burr Baker, Jr. (Johnny) and Alta Baker, appeal the judgment of the trial court in favor of the plaintiffs, Wilma Young Baker and the Succession of John Burr Baker, Sr.[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2006, Wilma, the mother of Johnny, and the Succession of John, Sr. filed a petition for the return of $1,592,500 in loans made to her son and his wife, Alta, prior to her husband's death in May 2003.[2] Johnny and Alta vehemently deny that the monies were loans and instead claim that they were donations. Extensive litigation followed, including a petition filed by Johnny to have his mother disinherited. Shortly before the trial commenced, Johnny filed a renewed motion on peremptory exception of prescription and for directed verdict. A four-day trial was held over a time period from January 2008 through August 2008. In its January 2009 judgment, the trial court found that $1,492,500 were loans that had to be repaid by Johnny and Alta. The defendants filed various exceptions following the trial, and the plaintiffs filed a motion to strike testimony from the defendants' post-trial memorandum which was ruled inadmissable at trial. The defendants' exceptions were denied, and the plaintiffs' motion to strike was granted. Johnny and Alta now appeal and assign as error:

1. The trial court's findings that the monies given were loans as opposed to gifts or reimbursements.

2. The trial court's finding that the total amount of money

---

[1]Throughout this opinion we refer to John Burr Baker, Jr. as "Johnny" as this is what he was referred to throughout the trial record.

[2]On the third day of trial, the plaintiffs withdrew their claim for a $100,000 check numbered 841 from their claim against the defendants because it could not be determined if that particular check was deposited, hence, the $100,000 reduction in the judgment.

1

received was $1,492,500 because that number is an arithmetic error.

3.    The trial court's finding that the claims had not prescribed.

4.    Alternatively, if all claims had not prescribed, the trial court's finding that an acknowledgment only to one creditor interrupted prescription as to the claims of all creditors.

5.    The trial court's exclusion of defendants' material witness and allowance of plaintiffs' "surprise" material witness.

6.    The trial court's refusal to consider their defense that their alleged debts had been extinguished by specific written and notarized renunciations of those debts.

## DISCUSSION

John, Sr. was a successful rice farmer prior to his death. In 1994, John, Sr. entered into a mineral lease in which he held a 20% royalty interest. Prior to the commencement of drilling of the well, he donated portions of his 20% royalty as follows: 5% to his wife, 3% to his son Dr. Tim Baker, 3% to his daughter Beryl Baker Wade, and 3% to the defendant, Johnny, Jr. Since 1994, the well has produced millions of dollars of mineral royalties for all members of the family. Beginning in October 1999, and continuing through March 2003, the deceased made over forty transfers of funds to the defendants totaling over 1.4 million dollars.

The four-day trial consisted of substantial testimony and documentary evidence. Brent Young, a tax lawyer from Shreveport, testified that Wilma is his aunt and John, Sr. was his uncle. He testified that he was very close with his aunt and uncle, socializing with them quite often and even traveling with them on occasion. He stated that he visited them at their home in Gueydan between eight and ten times per year. He testified that he discussed business and investment matters with John, Sr. routinely. Young went on to state that he had a close relationship with Beryl and

2

Tim, but not Johnny.

Young testified that he prepared tax returns and various legal instruments for many years for his aunt and uncle. He also began the succession proceedings upon John, Sr.'s death. Young next examined some checks that were admitted into evidence. Young said that the checks were issued by either John or Wilma to Johnny individually or Johnny and his wife. He said the total of the checks issued to Johnny and/or Alta was $1,592,500. Young testified that Wilma and John, Sr. indicated that the funds represented loans, and that this information was subsequently confirmed in conversations with Beryl, Tim, and Johnny. Young testified that he had multiple conversations over the years with John, Sr. and Wilma in which the loans were discussed. He even advised the Bakers to use a pad of hand notes in order to have some documentation of the loans.

Young then went on to describe situations in which Johnny acknowledged the nature of the loans. Young said that over lunch Johnny commented on how successful his businesses were and John, Sr. commented that they would not be without his "help." Young said that Johnny stated that "he was going to care of it," and would either pay Beryl and Tim directly to even them out or issue stock to them in his business ventures.

Young then discussed the handwritten ledger prepared by John, Sr. listing all of the individual loans made to Johnny and/or Alta. At the point in the ledger in which the total had reached $834,000, John, Sr. placed a handwritten notation stating, "I hope this is all." Young testified that seven checks were missing from the ledger as they had been issued shortly before John, Sr.'s death. Young then discussed a document he prepared in January 2004 that he sent to Wilma, Johnny,

3

Tim, and Beryl following John, Sr.'s death. The document extensively discusses the tax implications involved in the "cash advances" and "loans" made to Johnny and/or Alta and various scenarios that could occur regarding repayment of the loans. The first scenario addresses "what the final distribution [of John, Sr.'s estate] will look like if Johnny and Beryl repay their loans in full." The second, if neither repays their loans and the taxes are paid out of the assets of the estate, and the third, a partial repayment. The document addresses a separate loan made to Beryl in the amount of $500,000. Young then discusses the attached Estate Tax Return that he prepared for the federal government which lists the advances totaling $1,592,500 given to Johnny and Alta. Further, the loan made to Beryl was also listed as a "demand loan" or debt due to the decedent. Shortly thereafter, Young received notice that any correspondence should be sent to a CPA, Glenn Thibodeaux, rather than Johnny and Alta. In a letter to Young from Thibodeaux dated February 4, 2004, Thibodeaux stated, in reference to the letter Young sent to him:

> The letter did not address the loans made to Beryl and Johnnie. Your recent letter **INCORRECTLY** refers to the interest accruing on those loans. Since no promissory notes exist, at best, these are non-interest bearing loans. The gift loan provisions are an IRS device only, and do not apply to the actual balance of the loans. The IRS rules impute the interest income as phantom income to the recipient and phantom expense to the payer. The resulting phantom gift to the payer is subject to gift tax, paid by the donor. Perhaps you need to also advise your clients about the unpaid gift taxes that are outstanding, and you should also reduce the value of the gross estate by the amount of interest you incorrectly claim is an asset of the estate.

Young testified that a letter that he composed and dated July 15, 2004, along with the succession proceedings, continued to refer to the indebtedness owed by Johnny and Beryl.[3] He stated that he had not "learned anything from anyone" that would give

---

[3]This was the second time Young sent out the documentation to be signed. The first time was seven months prior.

4

him an indication that the monies were to be treated as gifts rather than loans. This document was forwarded to Johnny, requesting his signature so that the succession proceedings could be finalized. However, correspondence dated August 16, 2004 sent to Young from Donald A. Capretz, an attorney, indicated that Johnny did not agree that there is any indebtedness owed by him to his mother and father.

Young composed a letter to Capretz dated August 19, 2004, in which he related that he was "repeatedly and consistently" told by John, Sr. and Wilma that the advances to Johnny would be repaid and that he had "several conversations" with Johnny in which he acknowledged that the loans would be repaid.

Young went on to testify that if the monies advanced to Johnny had been gifts, the Bakers would have been required to pay gift taxes and file gift tax returns, but that this was not done because he was always informed that they were loans.

Wilma, who was eighty-six at the time of trial, testified that the monies given to Johnny were loans and that he promised to pay them back. Wilma said that she and John, Sr. expected Johnny to pay back the loans. She said that she and John, Sr. advised Young to treat the cash advances as loans, not gifts.

Beryl testified that Young has always been close with the family and has taken care of all of her parents' accounting and legal needs. Beryl testified that there was "never a question" that the monies advanced to Johnny and Alta were loans, not gifts. She said that Johnny told her on several occasions after her father's death that he would pay back the loans either by paying her and Tim directly or by issuing stock in his company. She said these conversations took place following John, Sr.'s death in May 2003 through November 2003, at which point Johnny and Alta abruptly stopped talking to the rest of the family. She said that Johnny and Alta talked about

5

their business "nonstop" and how well it was doing financially and that they were going to pay back the loans. Beryl testified that her father discussed with her that the monies he gave Johnny were loans. She said that her father repeatedly requested that Johnny sign promissory notes, but that Johnny refused to sign the notes. Beryl further said that her mother has consistently acknowledged the monies given as loans, not gifts. She said that Young was present at some of the conversations in which the loans were discussed. Beryl went on to testify that her parents have paid for her children's school tuition since they were in high school and gave her thirty acres of land twenty-five years ago. She described how she has been the primary caretaker of her parents and the various houses she and her husband have purchased to accommodate her parents. Beryl testified that her father was "very angry" with Johnny at the time he was in the hospital dying because Johnny was not paying back the money as he said he would. Beryl testified that, before Johnny and Alta abruptly stopped speaking to the rest of the family, she would have dinner at her house every night and it was common knowledge and commonly discussed among all the family members that Johnny was to repay the loans. She testified that "you couldn't be around Johnny and Alta without them discussing their business ad nauseam and how they were going to make a lot of money and pay the money back. It happened all the time."

Tim, an anesthesiologist, testified regarding conversations he had with his father regarding the money lent to Johnny. Tim testified that in 2001 or 2002, he informed his dad that he believed Johnny had "gotten himself in trouble" and that he needed to "loan him some more money." He testified that the advances made to Johnny were "frequently" discussed amongst the family members and in Johnny and

Alta's presence. He said that both his mom and dad considered the advances loans. Tim further testified that he lent Johnny $50,000 and had to ask three times before the money was returned to him. Tim testified that in his family loans were made without promissory notes. He further testified that his dad was disappointed that Johnny could not live within his budget and that he was afraid Johnny would lose his home if his dad did not lend him some money. Tim testified that he preferred to stay out of this situation as much as possible, but that it was common knowledge amongst everyone that the monies advanced were loans, not gifts.

Johnny testified that prior to his father's death he stayed at the hospital with him on two or three occasions. Johnny testified that his father was not angry with him and told him that he was giving him the money. Johnny testified that he would shop for his father buying things like diamond bracelets and Rolexes and that his father would issue him checks to reimburse him for the shopping trips. He further testified that his father never asked him to sign a promissory note. Johnny testified that only one of the checks was a loan and that was the one in which his father wrote "loan to Johnny and Alta" in the memo area of the check. Johnny denied ever sitting around the family table making promises to repay loans. He claimed he was out of the country for many months in the middle east performing classified governmental work of a nature he could not discuss. He testified that his father repeatedly told him that he was giving him the money and not to let "anyone shame him about it."

When questioned about why his CPA, Capretz, referred to the monies as loans three times in his letter to Young, Johnny had no explanation. He further testified that he did not ask that an amended letter be sent out referring to the advances as gifts. He further claimed to have never seen Young's response letter in

7

which he stated that it was common knowledge that the advances were loans. Johnny admitted he had no documentation to support his claim that some of the monies were reimbursements, nor could he testify as to certain amounts being reimbursements. Johnny stated that he went to Beryl's house on the day of the funeral and never returned. He denied regular visits up until late October 2003. Johnny testified that Wilma, Beryl, Tim, and Young were all lying.

Glenn Thibodeaux testified that his letter was not intended to acknowledge the advances as loans, but to point out an error in calculation if they were loans. He admits that his letter does not indicate that the advances might not be loans, but he stated that he was only addressing the tax implications of what was in the returns prepared by Young. Nevertheless, Thibodeaux stated he did speak with his client, Johnny, before sending out the letter and that Johnny informed him the advances were not loans, but he did not mention that in the letter. Thibodeaux further testified that in January 2004, when he hand-delivered his letter to Beryl's house, both Beryl and Wilma considered the advances loans. He admitted that Johnny and Alta have never disputed the receipt of the funds, just the nature of the funds as gifts rather than loans. Thibodeaux testified that Johnny hired Capretz as an expert to determine if the advances were loans or gifts, but that he never gave an opinion and was not present to testify at trial.

Alta testified that the monies were never a loan but were either a gift or to repay her and Johnny for different things. She stated that the money was always given by check and there was never an agreement to pay it back. She said the only exception was for the check that John, Sr. indicated was a loan and that John, Sr. told her the check was for something he asked Johnny to do. She stated that John, Sr. was

8

a very generous man and would often give her and Johnny money to give to others. Alta relayed a story in which John, Sr. gifted substantial sums to a seminary student. She further testified that some of the checks were reimbursement for insurance expenses, farm equipment, construction, jewelry, and various personal services. However, Alta admitted she had no documentary evidence to support her reimbursement claims.

Alta claimed Wilma was present at the meeting in which John, Sr. told her that the money was a gift or reimbursement except for the check indicating "loan." Alta was questioned about the ledger John, Sr. kept in which he wrote "dept" next to the sum owed by Johnny and Alta, which at the time amounted to $1,237,000. Alta said it was not referring to "debt" but "department" as John, Sr. liked to separate his money out into "departments." She testified that "everything he did was departmentalized so that he knew where the money went[.]"

Rose Mouton, Johnny and Alta's housekeeper, testified that she began working for them in 2000, and generally cleaned their home three to five times per week. She stated that she witnessed John, Sr. give a check to Johnny on one occasion and that he indicated it was a gift. However, on cross-examination she admitted that she did not remember John, Sr. indicating that it was a gift in her deposition taken in December 2007. In fact, she testified at that time that she was not privy to any conversations and that she "walked away" while the check was being handed over on two occasions.

Regan Wade, Beryl's daughter, testified that she was a student at Centenary College studying elementary education. She testified that Johnny and Alta maintained contact with the family through the fall of 2003 and she saw them quite

regularly usually two to three times per week.

The trial court, in its oral reasons, found:

> The Court has listened to the testimony of these witnesses, very lengthy testimony, where [sic] that these advances were addressed as loans, and the discussion of how they were going to be paid were discussed among the whole family members over numerous times. This has been verified by the testimony of the family's attorney, Mr. Young, concerning how these were going to be done, and – and what impresses the Court most is after the death of the decedent the discussion of how these advances were going to be dealt with were loans. At no time did the estate know or become aware that these advances were not loans until Mr. Capretz' letter specifically stating that his client did not consider them loans.

## DONATIONS OR LOANS

We will not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

> The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Id*. at 844.

Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Id.* "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart v. State Through DOTD*, 617 So.2d 880, 883 (La.1993). "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id*. at 882.

10

The issue of whether the monies advanced were a donation or loan is a factual one. A gift may be made to another person "by delivery of the thing to the donee without any other formality." La.Civ.Code art. 1543. The donee bears the burden of proving, by strong and convincing evidence, that he was the recipient of a gift rather than a loan. *See Funderburk v. Funderburk*, 214 La. 717, 38 So.2d 502 (La.1949), *Succession of Serio*, 597 So.2d 91 (La.App. 4 Cir.), *writ denied*, 600 So.2d 677 (La.1992). We find no error in the trial court's finding that Johnny and Alta failed to prove that the monies advanced were gifts rather than loans. There was substantial, nearly overwhelming evidence to the contrary. Apart from the testimony, the documentary evidence of the ledger of the decedent and the correspondence from Thibodeaux to Young confirm that everyone considered the advances loans. Johnny and Alta failed to prove that the advances made within three years of John, Sr.'s death were partially gifts and partially reimbursements for various performances by Johnny and Alta over a thirty-year period. Additionally, the testimony of Johnny's own mother (with whom he maintained a very close relationship through the fall 2003) that the advances were well known amongst the family as loans, is telling. Accordingly, the trial court's findings are not manifestly erroneous and this portion of the judgment is affirmed.

## CALCULATION ERRORS

In this assignment of error, Johnny argues that it was erroneous for the trial court to conclude that the total amount of money received was $1,492,500 because that number is an arithmetic error and should be $1,45,.500. Again, we find no error in the trial court's finding. Young testified that John, Sr. specifically included the disputed $40,000 advance on three different ledgers. However, there is

11

no representative check in the documentary evidence for that amount. Clearly, the trial court found persuasive Young's testimony that he believed this was a cash loan. Accordingly, this assignment of error is without merit.

**PRESCRIPTION**

In assignments of error three and four, Johnny argues that the plaintiffs' claims have prescribed pursuant to La.Civ.Code art. 935. An action for the recovery of money lent is subject to a liberative prescriptive period of three years pursuant to La.Civ.Code art. 3494. The supreme court recently addressed prescription in *Rando v. Anco Insualtions, Inc.*, 08-1169, p. 10 (La. 5/22/09), __ So.3d ___, ___:

> If prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. *Carter*[*v. Haygood*, 04-0646 (La.1/19/05),]892 So.2d at 1267. If evidence is introduced at the hearing on the peremptory exception of prescription, the district court's findings of fact are reviewed under the manifest error-clearly wrong standard of review. *Stobart v. State, through DOTD*, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*, 617 So.2d at 882-83.

"Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe." La.Civ.Code art. 3464. Acknowledgment may be "oral or written, formal or informal, and express or tacit." *See* Comment (e) to La.Civ.Code art. 3464 and *Flowers v. United States Fidelity and Guaranty Co.*, 381 So.2d 378 (La.1980). The last check was issued to Johnny on March 14, 2003. Wilma filed suit on August 10, 2006. Thus, Johnny and Alta had to acknowledge the debt after August 10, 2003. Again, the trial court did not err in finding that prescription has been interrupted. Although the issue was hotly contested at trial, clearly the trial court found the testimony of multiple witnesses established that Johnny and Alta continued to have contact with the remainder of the family through

12

late October or early November 2003, and continued to acknowledge that he and Alta would repay the loans.  Johnny further argues that acknowledgment only interrupted prescription as to Beryl's personal claim as a creditor.  We find no merit in this argument.  There was testimonial evidence by multiple family members that Johnny and Alta continued to visit the family.  Clearly, the trial court chose not to believe Johnny's testimony that he never spoke to another family member again following his father's funeral.  Accordingly, this assignment of error is without merit.

**WITNESSES**

Johnny argues he is entitled to a new trial because of material errors due to the allowance and exclusion of witnesses at trial.  Pursuant to La.Code Civ.P. art. 1551, a trial court has discretion in the matters to be determined pre-trial including what witnesses will be allowed to testify at trial.  In this matter the trial court issued a pre-trial order stating:

> All parties are to exchange the name of any "may call" witnesses within **thirty (30) days** of the date of the Pre-Trial Order.  Further, all parties are to exchange, and file into the record (in pleading form), the names of any and all "will call" witnesses no later than **fifteen (15) working days** prior to the trial date.  A witness not so listed will not be permitted to testify.

At the end of the pre-trial order, it is again reiterated: "Failure to comply with any part of this Order will result in . . . refusal to allow the offending party to present the evidence or witness not previously disclosed[.]" A trial court's rulings in pre-trial matters are given great deference in the absence of an abuse of discretion. *Munster v. Bill Watson Ford, Inc.,* 07-0294 (La.App. 4 Cir. 10/24/07), 970 So.2d 36.  It appears that, although the defendants forwarded a copy of the may-call and will-call lists to the plaintiffs, they failed to file a copy in the record.  Moreover, the witness in question, Steven Seigler, was not listed on either the "may-call" or "will-call" lists.

13

On December 18, 2007, a few weeks before the start of trial, the defendants filed an amended witness list in the record which listed Seigler. The trial court sustained the plaintiffs' objection to the introduction of the testimony as they had not had the opportunity to depose the witness. We find no abuse of discretion in that ruling. Simply, the defendants should have listed the witness on the original may and will-call lists and should have filed them in the record.

Next, the defendants complain the trial court abused its discretion in allowing the rebuttal testimony of Regan and Colin Wade. Considering that the defendants were present at the deposition of Colin Wade and did not request to depose Regan, and, moreover, did not file a contemporaneous objection to the introduction of this testimony, we find no merit in this argument.

Next the defendants complain it was error for the trial court to exclude testimony of Mouton in which she stated that she overheard Beryl telling Tim that Johnny would get nothing. As that testimony is classic hearsay, we find no abuse of discretion in the trial court's refusal to allow such testimony.

## RENUNCIATION

In this assignment of error, Johnny argues that Wilma, Beryl, and Tim renounced the debt that forms the basis of the lawsuit based on a package of documents that they signed at the request of Young. This argument is without merit.

As part of the package of documents that Young sent out in order to effectuate the closing of John, Sr.'s succession is a cover letter dated July 15, 2004. In that letter addressed to Wilma, Johnny, Tim and Beryl, Young states in part (emphasis added):

> The Acts of Renunciation provide that no one will receive as part of their inheritance a debt due from either Johnny or Beryl. These also

14

relieve Johnny and Beryl of any liability for the portion of these advances which are included in the estate—effectively extinguishing that obligation. *This also, therefore, passes their respective obligations to them as a portion of their inheritance.*

The particular act signed by Wilma, Tim, and Beryl with respect to Johnny states:

That they, WILMA YOUNG BAKER, TIM YOUNG BAKER, and BERYL KATHERYNE BAKER WADE do hereby waive, relinquish, renounce, and disclaim any and all inheritance rights, of every nature whatsoever, including any usufructuary rights or rights as naked owners due them under the laws of the state of Louisiana or granted or confirmed under the Last Will and Testament of decedent, and to that portion of the succession or estate of JOHN BURR BAKER, SR., who died on May 17, 2003, domiciled in Vermillion Parish, Louisiana, more particularly described below:

### COMMUNITY PROPERTY

DEBTS DUE DECEDENT

Demand loans to John B. Baker, Jr., October 28, 1999 through March 14, 2003, with principal of $1,592,500, accrued interest of $121,058.89 based on monthly Mid Term Applicable Federal Rate.

The Petition for Possession goes on to state in part (emphasis added):

5.

As will appear from the Acts of Partial Renunciation and Disclaimer filed herein, Petitioners have renounced usufructuary and naked ownership interests in certain debts due decedent from Petitioners JOHN B. BAKER, JR., and BERYL KATHERYNE BAKER WADE. *Petitioners desire that these debts due decedent be allocated to the*

15

*respective debtor as a portion of their distributive share.*

We note first that the Act of Renunciation was never signed by Johnny. Wilma, Beryl, and Tim did sign it. It is very clear from a simple reading of this document that the renunciation was a tool used so that both Johnny and Beryl's inheritance would be reduced by the amount of debt each owed to the estate.

The trial court addressed the defendants' desire, after the trial on the merits, to amend their answer to plead either the affirmative defense of renunciation or no right of action based on a voluntary admission.[4] The trial court denied the introduction of the affirmative defense of renunciation stating:

> I specifically addressed this issue at trial. It was raised as an affirmative defense, and I said it had not been specifically pled in the answer, and therefore, that it was waived.
>
> Now, at this time, I am not going to allow the answer to be amended after the trial of the case to allow an affirmative defense to be bled. I've already ruled.
>
> Now, to get to the peremptory exception of no cause of action or no right of action, I know that the cases that have been cited by Mr. Anderson deals with the extinguishment of debt, but if Look at the not cause of action, there's been nothing presented to me on the no cause of action, and, therefore, I'm going to deny the no cause of action at this time.
> As to the no right of action, the —the plaintiffs [sic] have decided not to put on any evidence, and , therefore, no witnesses will be called, and there is no evidence presented to me. Therefore, I'm going to deny the no right of action at this time.

We find no error in that ruling. Accordingly, this assignment of error is without merit.

_____

**CONCLUSION**

The judgment of the trial court in favor of the plaintiffs, Wilma Young

---

[4]These terms are used interchangeably. We note that the issue was raised at trial at which time the plaintiffs objected because the affirmative defense was not in the defendants answer. The trial court found in favor of the defendants.

Baker and Succession of John Burr Baker, Sr., is affirmed.  All costs of this appeal are assessed against the defendants-appellants, John Burr Baker, Jr. and Alta Baker.

**AFFIRMED**.

17