# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 11-0002

CARL JONES, ET AL.

VERSUS

CENTERPOINT ENERGY ENTEX, ET AL.

### CONSOLIDATED WITH

### 11-0003

STEVEN JOSEPH, ET AL.

VERSUS

CENTERPOINT ENERGY ENTEX, ET AL.

************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NOS. 04-C-2184-D AND 04-C-2357-B
HONORABLE DONALD W. HEBERT, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Jimmie C. Peters, Marc T. Amy, and Phyllis M. Keaty, Judges.


AFFIRMED.

**Randolph A. Piedrahita**
**Kirk A. Guidry**
**B. Scott Andrews**
**Dué, Price, Guidry, Piedrahita & Andrews, P.A.**
**8201 Jefferson Highway**
**Baton Rouge, LA 70809**

**(225) 929-7481**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Carl Jones, Sr.**
    **Brenda Jones**
    **Steven Joseph**
    **Constance Joseph**

**Patrick C. Morrow**
**Morrow, Morrow, Ryan & Bassett**
**324 West Landry Street**
**Opelousas, LA 70571**
**(337) 948-4483**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Carl Jones, Sr.**
    **Brenda Jones**
    **Steven Joseph**
    **Constance Joseph**

**Victor J. Versaggi**
**Jamie P. Parker**
**Domengeaux, Wright, Roy & Edwards**
**556 Jefferson Street, Suite 500**
**Lafayette, LA 70502**
**(337) 233-3033**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Carl Jones, Sr.**
    **Brenda Jones**
    **Steven Joseph**
    **Constance Joseph**

**Edward P. Landry**
**Landry, Watkins, Repaske & Breaux**
**P. O. Drawer 12040**
**New Iberia, LA 70562-2040**
**(337) 364-2715**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Centerpoint Energy Entex**
    **Centerpoint Energy Resources Corporation**
    **Centerpoint Energy Marketing, Inc.**
    **Entex Gas Resources Corporation**
    **Centerpoint Energy Gas Services, Inc.**
    **Centerpoint Energy Gas Transmission Company**
    **Reliant Energy Resources Corporation**

**Randy G. Donato**
**Robbie A. Moehlmann**
**Donato, Minx & Brown**
**3200 SW Freeway, Suite 2300**
**Houston, TX 77027**
**(713) 877-1112**

**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Centerpoint Energy Entex**
    **Centerpoint Energy Resources Corporation**
    **Centerpoint Energy Marketing, Inc.**
    **Entex Gas Resources Corporation**
    **Centerpoint Energy Gas Services, Inc.**
    **Centerpoint Energy Gas Transmission Company**
    **Reliant Energy Resources Corporation**

**H. Alston Johnson, III**
**Daina Bray**
**Phelps Dunbar L.L.P.**
**P.O. Box 4412**
**Baton Rouge, LA 70821-4412**
**(225) 346-4412**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Centerpoint Energy Entex**
    **Centerpoint Energy Resources Corporation**
    **Centerpoint Energy Marketing, Inc.**
    **Entex Gas Resources Corporation**
    **Centerpoint Energy Gas Services, Inc.**
    **Centerpoint Energy Gas Transmission Company**
    **Reliant Energy Resources Corporation**

PETERS, J.

The litigation that gave rise to these consolidated cases has as its origin an early morning explosion and fire at the Opelousas, Louisiana, home of the Carl Jones, Sr. family, on June 15, 2003. Seven family members occupying the house at the time of the incident sustained serious physical injuries. The suits filed by and on behalf of the injured family members named a number of interrelated legal entities as being responsible for the injuries sustained (Centerpoint Energy Entex; Centerpoint Energy Resources Corporation; Centerpoint Energy Marketing, Inc.; Entex Gas Resources Corporation; Centerpoint Energy Gas Services, Inc.; Centerpoint Energy Gas Transmission Company; and Reliant Energy Resources Corporation), which we will refer to collectively as Centerpoint Energy. A jury returned a verdict awarding monetary damages to those injured in the explosion and fire, as well as consortium damages to the parents of one of the injured children; assessing Centerpoint Energy with fifty percent of the fault in causing those injuries; and assessing the remaining fifty percent of the fault to Mr. Jones. After the trial court executed a judgment conforming to the jury's verdict, Centerpoint Energy perfected this appeal, asserting four assignments of error. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

The bare essentials of the events leading up to this tragic incident are not in dispute, although certain key factual issues are disputed. On May 7, 2003, Larry M. West, a senior service technician who works for Centerpoint Energy, disconnected the natural gas service at the house occupied by the Jones family because of a delinquent account balance for gas service already provided. Thirty-eight days later, on the evening of June 14, 2003, Mr. Jones reconnected the natural gas service, and

at approximately 4:00 a.m. the next morning the explosion occurred. Mr. and Mrs. Jones; their four children, Marquetta, Bianca, Carl, Jr., and Dashawana; and their granddaughter, Dai'Jhnea Joseph, all sustained severe personal injuries.

Mr. and Mrs. Jones filed suit against Centerpoint Energy on May 26, 2004, seeking to recover for their individual injuries as well as for those sustained by their four minor children. On June 7, 2004, Dai'Jhnea's parents, Steven and Constance Joseph, filed suit against Centerpoint Energy seeking to recover for their daughter's injuries as well as their own consortium damages. On May 5, 2008, the trial court consolidated the separate suits. On July 14, 2010, Mr. Jones voluntarily dismissed his personal claim against Centerpoint Energy but maintained the claims he had brought on behalf of his children.

The trial on the merits lasted five days, beginning July 19, 2010. After apportioning fault equally between Centerpoint Energy and Mr. Jones, the jury then awarded Dashawana $4,970,931.47;[1] Marquetta $1,597,405.73; Bianca $151,441.49; Carl, Jr. $68,363.17; Mrs. Jones $918,947.29; Dai'Jhnea $7,607,354.09; Mr. Joseph $100,000.00; and Mrs. Joseph $100,000.00. In its appeal, Centerpoint Energy asserts four assignments of error:

> 1.        The trial judge erred in denying the defendants' mid-trial motion for a directed verdict and in thereafter permitting the case to go to the jury, because the ambit of protection spread by the duty of the defendant gas supplier to act reasonably in turning off service for non-payment does not extend to the protection of the plaintiffs against injury by explosion and fire caused in part by the conduct of the gas supplier and in part by the subsequent negligent, intentional, criminal and then grossly negligent conduct of a third person.

---

[1]The jury incorrectly calculated Dashawana's total award as $4,790,931.47, but the trial court corrected this error in its judgment.

2

2.        The jury erred in assigning only 50% negligence to a third person engaged in negligent, intentional, criminal and then grossly negligent conduct subsequent to the act of the defendant gas supplier in turning off gas service for non-payment.

3.        The jury erred in its award of damages to certain of the plaintiffs.

4.        The trial judge erred in permitting the admission of a report on "Gas Usage on Locked Meters" wholly comprised of entries after the incident at issue in this litigation, and in refusing to permit the admission of an amended report and testimony to explain the two reports.

**OPINION**

*Assignment of Error Number One*

This assignment of error does not address the jury's verdict. Instead, Centerpoint Energy argues that the trial court erred in ever allowing the matter to reach the jury for decision. It bases this argument on the trial court's rejection of its motion for a directed verdict filed pursuant to La.Code Civ.P. art. 1810 at the close of the plaintiffs' case on liability. Centerpoint Energy asserts on appeal that the trial court erred in not granting its motion.

In considering this assignment of error, we first note that "a motion for directed verdict should be granted only if the facts and inferences are so overwhelmingly in favor of the moving party that the court finds that reasonable men could not arrive at a contrary verdict." *Guste v. Nicholls Coll. Found.*, 564 So.2d 682, 688-89 (La.1990). In considering the motion, the trial court is to weigh all evidentiary inferences in a light most favorable to the nonmovant—in this case the plaintiffs. *Courville v. City of Lake Charles*, 98-73 (La.App. 3 Cir. 10/28/98), 720 So.2d 789. This court reviews *de novo* a trial court's ruling on a motion for directed verdict which challenges the legal sufficiency of the evidence, and in doing so, we consider

3

the evidence in light of the substantive law applicable to the nonmoving party's claim. *Hall v. Folger Coffee Co.*, 03-1734 (La. 4/14/04), 874 So.2d 90; *Frazier v. Zapata Protein USA, Inc.*, 02-605 (La.App. 3 Cir. 12/11/02), 832 So.2d 1141, *writs denied*, 03-145, 03-126 (La. 3/21/03), 840 So.2d 537, 539.

To prevail in their personal injury suit, the plaintiffs bore the burden of establishing that Centerpoint Energy was at fault in causing the accident, using a duty-risk analysis. This is a five-step process which requires a party asserting fault of another in causing him damages, to establish: (1) that the party whose fault is at issue had a duty to conform his conduct to a specific standard, (2) that the party's conduct failed to conform to the appropriate standard, (3) that the party's conduct was a cause-in-fact of the injuries at issue, (4) that the party's substandard conduct was a legal cause of the injuries at issue, and (5) that there were actual damages. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. The plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095 (La. 3/10/06), 923 So.2d 627.

At trial, and to accommodate the schedule of the plaintiffs' principal physician witness, the parties agreed to address the damage issue out of order. That being the case, when Centerpoint Energy moved for its directed verdict, the plaintiffs had completed their evidence presentation with regard to the liability issue only. Thus, the damage element of the duty-risk analysis is not at issue in this assignment of error. Instead, Centerpoint Energy argues on appeal that the trial court should have granted its directed verdict motion because the plaintiffs failed to establish three factors: that Centerpoint Energy's conduct failed to conform to the appropriate standard; that Centerpoint Energy's conduct was a cause-in-fact of the plaintiffs'

4

injuries; and that Centerpoint Energy's substandard conduct was a legal cause of the plaintiffs' injuries.

*Duty Issue*

As pointed out by this court in *Giordano v. Rheem Manufacturing Co.*, 93-1614, p. 8 (La.App. 3 Cir. 10/5/94), 643 So.2d 492, 496:

> It is a well settled tenet of our jurisprudence, and common knowledge as well, that natural gas, being highly flammable and explosive in nature, is an inherently dangerous instrumentality. Those who handle and distribute it are charged with that degree of care commensurate with its dangerous character for the protection of the public from any foreseeable injury.

It was not disputed at trial that Centerpoint Energy's applicable standard of care in disconnecting service to a customer is governed by 49 C.F.R. 192.727, which provides three methods of acceptable compliance:

> Whenever service to a customer is discontinued, one of the following must be complied with:
>
> (1)  The valve that is closed to prevent the flow of gas to the customer must be provided with a locking device or other means designed to prevent the opening of the valve by persons other than those authorized by the operator.
>
> (2)  A mechanical device or fitting that will prevent the flow of gas must be installed in the service line or in the meter assembly.
>
> (3)  The customer's piping must be physically disconnected from the gas supply and the open pipe ends sealed.

49 C.F.R. 192.727(d).

John Edward Eades, Centerpoint Energy's Operations Supervisor, explained that company policy requires a technician disconnecting a customer's gas service to close the valve at the meter, disconnect the meter from the delivery line on the outlet or house side of the meter, and insert a plate into the interior of the line. Once this plate is secured in place by two gaskets, the technician must then reconnect the outlet

5

line to the meter and secure the valve on the meter with a plastic locking device. Attached to the plastic locking device is a red tag which contains a warning that a penalty will be imposed on anyone who removes the device.

The plate inserted into the line is referred to as a "blind plate" for obvious reasons—its presence is not apparent to any unauthorized individual attempting to turn the gas on at the meter. The effect of the blind plate is to prevent gas from flowing into a structure even if the plastic locking device is removed and the valve is turned on. Mr. Eades testified that although disconnecting the outlet pipe from the meter and inserting the blind plate is not a complicated task, it does require the use of adequate tools for the job. He suggested that the technician would need at least a fourteen-inch crescent wrench to exert enough torque to break loose the connections.

With regard to compliance with 49 C.F.R. 192.727(d), Mr. Eades acknowledged that the plastic locking device alone does not meet the requirements of the regulation because an unauthorized individual could easily break and remove the plastic device with any small household tool and open the valve to reconnect gas service. Additionally, he testified that because most disconnects for nonpayment are reconciled with the customer almost immediately and the service reinstated, Centerpoint Energy seldom invokes the option available under 49 C.F.R. 192.727(d)(3), to totally disconnect the line and remove the meter. He did testify, however, that the blind plate by itself met the requirements of 49 C.F.R. 192.727(d)(2).

Centerpoint Energy's former Operations Manager for Louisiana, Daniel Hebert, analyzed the use of the blind plate and plastic locking device slightly differently from Mr. Eades. According to Mr. Hebert, who had been retired slightly over four years

6

when he testified at trial, the blind plate is simply a backup to the plastic locking device, and that both were needed to comply with the company's standard of care.

Douglas Buchan, an expert in the field of natural gas operations from St. Petersburg, Florida, who testified for the plaintiffs, disagreed with Mr. Hebert that the plastic locking device was primary and the blind plate secondary. In his opinion, any device such as the plastic locking device that can be opened with ordinary household tools could not be considered a locking device sufficient to satisfy the regulation. Mr. Buchan testified that throughout much of the natural gas service industry, a metal locking device which he referred to as a "barrel lock" is used in place of the plastic locking device, and that the use of such a device would satisfy the requirements of 49 C.F.R. 192.727(d)(1). The principal difference between his testimony and that of Mr. Eades as it relates to the breach of duty element of proof, is that he testified that the technician's insertion of a blind plate as described by Mr. Eades would take five to ten minutes to complete the process. Mr. Eades suggested the same task would require only a "couple of minutes."

When questioned about the use of the metal locking device suggested by Mr. Buchan, Mr. Hebert testified that he was a member of a Centerpoint Energy committee which had considered using such a device but rejected it because of the cost, rust accumulation, and weight.

***Breach of Duty Issue***

The overwhelming substance of the testimony is that almost everyone agrees, that while the plastic locking device by itself does not meet the standard of care applicable to Centerpoint Energy, use of either the blind plate or the metal locking device does. Given the testimony on this issue, the pivotal factual issue with regard

7

to the breach of duty element of the duty-risk analysis is whether Centerpoint Energy's technician followed company policy and properly inserted the blind plate when disconnecting the Jones' natural gas service. The eyewitness factual evidence on that issue of what occurred when Mr. West disconnected the gas service on May 7, 2003, was presented primarily by Dashawana and Mrs. Jones.[2]

Dashawana, who was seventeen years old at the time of the fire and explosion and twenty-four years old at the time of trial, testified that she and her mother were sitting on the front porch of the house when the technician came to disconnect the gas service. According to Dashawana, the technician appeared in the yard with a red tag in his hand and asked her mother if she was going to pay the delinquent bill. She heard her mother tell the man that he could shut the gas off because they had decided to use only electricity in the future. Dashawana testified that the technician then went to the side of the house where the meter was located, returned in less than three minutes, and left the premises. Mrs. Jones testified to the same factual scenario as her daughter and added that when Mr. West appeared at their home, he had nothing but the reg tag in his hand. Additionally, she observed that he had no tool belt or anything else that he could have used to disconnect the line and install the blind plate.

Reviewing *de novo* the evidence that was available to the trial court at the time it ruled on Centerpoint Energy's motion for directed verdict, and weighing the evidentiary inferences in a light most favorable to the plaintiffs, we conclude that reasonable men could find that installing the plastic locking device was not sufficient to comply with the standard of care, that Centerpoint Energy's technician did not

---

[2]Mr. West, the technician who actually performed the disconnect procedure on the Jones house, testified after the trial court had rejected Centerpoint Energy's motion for directed verdict. Therefore, his testimony in not pertinent to the disposition of this assignment of error.

properly install a blind plate on the meter,[3] and, therefore, Centerpoint Energy did not comply with the applicable standard of care.

***Cause-In-Fact***

The cause-in-fact element of the duty-risk analysis generally involves a "but for" inquiry, which questions whether or not the injury would have occurred "but for" the defendant's substandard conduct. *Theriot v. Lasseigne*, 93-2661 (La. 7/5/94), 640 So.2d 1305. "Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident." *Perkins v. Entergy Corp.*, 00-1372, 00-1387, 00-1440, p. 8 (La. 3/23/01), 782 So.2d 606, 611 (footnote omitted).

Again weighing the evidentiary inferences in a light most favorable to the plaintiffs, we conclude that reasonable men could find that Centerpoint Energy's failure to properly terminate the Jones' natural gas service was a substantial factor in causing the explosion and fire.

***Legal Cause***

Finally, Centerpoint Energy asserts that its actions were not the legal cause of the plaintiffs' injuries. In making this argument, Centerpoint Energy argues that Mr. Jones' reconnection of the gas service constituted intervening conduct that was not only grossly negligent, intentional, and criminal, but also not foreseeable. In considering this argument at the trial level, the evidence before the trial court consisted primarily of the testimony of the various family members describing the events between the May 7, 2003 cut off of service and the June 15, 2003 explosion.

_____

[3]No blind plate was recovered from the scene after the explosion and fire.

9

True to Mrs. Jones' statement to Mr. West, sometime after the May 7 disconnect, Mr. Jones and Carl, Jr. removed the gas stove from the kitchen and stored it in a shed behind the house. However, in doing so, they failed to cap the then-open service line in the house.[4] This open service line later proved to be the source of the gas that entered the house on the evening of June 14 and the early morning hours of June 15, 2003.

Although the Jones family replaced the gas stove with an electric one, they did not replace the gas hot water heater. Without an independent source of hot water, all hot water needs for washing, bathing, and any other task had to be fulfilled by heating water on the electric stove. According to Mr. Jones, this lack of hot water in the home and his attempt to keep from being embarrassed by these circumstances led to his ill-advised attempt to reconnect the gas service on the evening of June 14, 2003.

June 15, 2003 was Father's Day, and the Jones family had invited their Pastor and some church members to share a meal at their house on that day. Mr. Jones testified that he basically felt a need to be "the man of the house" and remedy the embarrassing lack of hot water for his family. He testified that at approximately 8:30 on the evening of June 14, 2003, he used a crescent wrench to "pop the little tag off the meter" and open the valve. Not only did he not disconnect the line to remove the blind plate, he did not know what a blind plate was until long into the litigation proceedings. After he unsuccessfully attempted to light the gas hot water heater that previously provided the family with hot water, he returned to the meter intending to shut off the valve. According to Mr. Jones, when he did return to the meter and attempted to turn the valve off, he was frightened away by lights from an approaching

---

[4]Mr. Jones acknowledged that Carl, Jr. helped him move the gas stove, but stated that he, not Carl, Jr., disconnected the stove from the supply line and failed to cap the open line.

vehicle and "didn't know if [he] turned it off or what." However, because the hot water heater would not ignite, he simply assumed that he had no gas service at all. Mr. Jones acknowledged that he knew what he was doing was not only wrong, but that it was criminal. Furthermore, he stated that he simply forgot he had not capped the line previously connecting the gas system to the gas stove. Mrs. Jones tried to explain her husband's lack of memory by referring to two strokes he suffered in 2001. According to Mrs. Jones, not only is her husband disabled from working, but he has suffered from memory loss since the strokes. None of the family even knew that he had attempted to reinstate the gas flow on the evening of June 14, 2003, until long after the litigation began.

Bedtime, according to the occupants of the house, was strictly enforced and fell between 8:30 and 9:00 p.m. on the evening of June 14, 2003. Thus, most of the occupants were either in bed or getting ready for bed when Mr. Jones attempted to reconnect the gas service to the house. While all the family members who were asked acknowledged smelling natural gas either inside or outside the house in the past, none testified at trial that the smell was present in the house before the explosion on June 15. Mr. Buchan credited this failure to detect the leaking gas to the fact that gas is lighter than air and that initially it filled up the attic and ceiling. Thereafter, according to Mr. Buchan, the occupants gradually became used to the smell without recognizing the change in their environment.

Mrs. Jones testified that at approximately 4:00 a.m., she awoke and began preparing to go to work. She took a sponge bath, woke Dashawana and told her to change Dai'Jhnea's diaper, and plugged in the coffee pot in the kitchen. As she returned to the bedroom, she heard an explosion and observed a large ball of fire

11

which appeared to originate from the children's bedroom traveling across the ceiling. Dashawana testified that as she changed the baby in her parents' bedroom, she also heard an explosion and saw a ball of fire enter the bedroom. The resulting fire throughout the house severely burned all of the occupants.

An intervening cause will relieve the original tortfeasor of liability if it "superceded the original negligence and alone produced the injury." *Adams v. Rhodia, Inc.*, 07-2110, p.14 (La. 5/21/08), 983 So.2d 798, 808. However, if the intervening cause is a foreseeable one, it is within the scope of the original tortfeasor's negligence.

> "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). "The scope of protection inquiry asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *Faucheaux v. Terrebonne Consol. Gov't.*, 615 So.2d 289, 293 (La.1993). Although we have unequivocally stated "the determination of legal cause involves a purely legal question," *Todd v. State, Dept. of Social Services*, 96-3090 (La.9/9/97), 699 So.2d 35, 39, this legal determination depends on factual determinations of foreseeability and ease of association. *See Perkins v. Entergy Corp.*, 98-2081 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 410, *affirmed*, 00-1372 (La.3/23/01), 782 So.2d 606.

*Rando v. Anco Insulations, Inc.*, 08-1163, 00-1169, pp. 30-31 (La. 5/22/09), 16 So.3d 1065, 1088.

Centerpoint Energy's argument on this issue is defeated by the testimony of its own administrative personnel. Mr. Eades suggested that the locking mechanisms used were necessary because it was simply common sense that people will try to steal natural gas after their supply has been cut off. Mr. Hebert was even more blunt. He answered in the affirmative when asked if the locking requirements were mandated "basically to protect people from their own ignorance" because people do not always

understand the dangers associated with natural gas. Mr. Buchan echoed these observations and suggested that Centerpoint Energy should have no illusions about people stealing natural gas.

We find that Mr. Jones' actions in leaving an uncapped gas line open in the house, breaking the plastic locking device and stealing natural gas, and negligently leaving the natural gas running into the house all night, are exactly the unsafe acts that Centerpoint Energy's duty to properly terminate service is designed to prevent. Weighing the evidentiary inferences in a light most favorable to the plaintiffs, we conclude that reasonable men could find that Mr. Jones' conduct was foreseeable. Therefore, Centerpoint Energy's argument that it should be relieved of liability based on Mr. Jones' intervening, superceding negligence is without merit.

We find no merit in this assignment of error.

### *Assignment of Error Number Two*

It is obvious from its verdict that the jury factually concluded that Mr. West either failed to install the blind plate or improperly installed it such that it allowed natural gas to leak into the house—and Centerpoint Energy does not dispute this factual finding in this assignment of error. Instead, Centerpoint Energy asserts that the jury erred in assigning only fifty percent of the fault to Mr. Jones. Centerpoint Energy argues that Mr. Jones should have been assessed at least ninety percent of the fault in causing the explosion and fire.

The jury is required to determine the fault of all persons causing or contributing to the plaintiffs' injury, death, or loss, regardless of whether the person is a party to the action or a nonparty. La.Civ.Code art. 2323(A). Our supreme court has held that the following five factors may influence the allocation of fault:

13

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.

*Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985).

An appellate court must give the jury's apportionment of fault great deference on review and must affirm that apportionment of fault unless it is manifestly erroneous or clearly wrong. *Dupree v. City of New Orleans*, 99-3651 (La. 8/31/00), 765 So.2d 1002. Thus, we review the facts of the case only to determine if the jury's conclusion that Mr. Jones was fifty percent at fault was manifestly erroneous. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. *Stobart v. State, Dept. of Transp. and Dev't*, 617 So.2d 880 (La.1993). Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

All of Centerpoint Energy's representatives testified that the company clearly recognizes the inherently dangerous nature of its product and has developed numerous measures designed to prevent explosions and fires, such as occurred in this litigation.[5] In fact, Mr. Hebert testified that the procedures for connecting and disconnecting gas service are based on the inherently dangerous nature of the product. Additionally, those same Centerpoint Energy representatives acknowledged that often the general public is not aware of the inherent dangers, even when subjected to an

---

[5]Mr. Hebert testified that all of the procedures developed for connecting and disconnecting a customer are based on knowledge of the dangers associated with the product, and Mr. Eades testified that company response to a reported leak is five minutes, given the dangers the product poses. Brent Andrepont, a service technician for Centerpoint Energy, testified that every natural gas leak is treated as a potentially dangerous situation.

14

advertising campaign alerting them to the dangers. Mr. Hebert made this point in his testimony, as did Mr. Andrepont who testified that quite often Centerpoint Energy's customers would simply forget about open pipes in their home that occur after the gas service has been disconnected. These assertions were echoed by both Mr. Buchan and Salvadore William Russo, Jr., Centerpoint Energy's fire and gas explosion investigation and pipeline safety expert.[6] In fact, Mr. Jones' testimony was a prime example of Mr. Andrepont's point. According to Mr. Jones, he simply forgot that he had failed to cap the delivery line when he disconnected the gas stove.

When Centerpoint Energy breached the applicable standard of care by failing to properly install the required blind plate, the risk created by that misconduct was that of potential catastrophic consequences. Mr. Jones' action in reconnecting the natural gas supply created no less a risk. Had either of them not breached the applicable duties imposed on them, this accident would not have occurred. However, when comparing the significance of what was sought by the conduct of each, Centerpoint Energy's fault far exceeds that of Mr. Jones. Not only did it fail to complete what all of those who testified to the issue suggested was a rather simple task—properly installing a blind plate—but violated a regulatory duty designed to prevent exactly the result which occurred in this unfortunate incident. Furthermore, clearly Centerpoint Energy fits in the capacity as the superior actor in this incident. As Mr. Hebert pointed out, Centerpoint Energy has an obligation to take every reasonable step to prevent its customers from tampering with its natural gas supply system. Furthermore, the Joneses' expert, Mr. Buchan, testified that the gas industry

---

[6]Although his testimony was not before the trial court when the trial court rejected the motion for directed verdict, Mr. Russo agreed that the plastic locking device alone did not meet the standard of care applicable to Centerpoint Energy's obligations in disconnecting gas service to a customer, and agreed that proper installation of the blind plate did meet the standard's requirements.

15

is well aware that customers will attempt to steal gas, and he stated that it is this knowledge around which its develops its lock out procedures.

Applying the *Watson* factors, and giving the jury's apportionment of fault the great deference it is entitled to on appellate review, we do not find that the jury was manifestly erroneous or clearly wrong in apportioning fault equally between Centerpoint Energy and Mr. Jones. Therefore, we find no merit in this assignment of error.

### *Assignment of Error Number Three*

In this assignment of error the defendants argue that the general damages awards to Dai'Jhnea, Dashawana, and Marquetta are excessive and that the loss of consortium awards to Mr. and Mrs. Joseph should be eliminated.[7]

### *General Damages*

"General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" *Duncan v. Kansas City S. Ry. Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682, *cert. dismissed*, 532 U.S. 992, 121 S.Ct. 1651 (2001) (quoting *Keeth v. Dept. of Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La.App. 2 Cir. 1993)). In considering whether the award of general damages is excessive, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), wherein the supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb

---

[7]Centerpoint Energy does not appeal the quantum awarded to Mrs. Jones, Carl, Jr., or Bianca.

16

an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id*. at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or reduce the award. *Id*.

The medical aspects of the children's injuries were testified to by Dr. Darrell Henderson, a Lafayette, Louisiana, plastic and reconstructive surgeon and an expert in long-term treatment of burn injuries. According to Dr. Henderson, all of the children had extensive burns which he described as "the most painful thing that humans have to go through." Dr. Henderson testified that not only did each child have to endure the pain and suffering associated with the burns themselves, as well as the initial treatment required to treat those injuries, but that the effect of these injuries will require a lifetime of continued treatment. He suggested that not only would the already-completed skin grafts have to be replaced every fifteen to twenty years, but the children's inability to perspire places them at high risk for heat stroke, and they will remain at an increased chance of skin cancer and infections for the remainder of their lives.

### Dai'Jhnea's Injuries

Dai'Jhnea was thirteen months old at the time of the explosion and fire, and she sustained second and third degree burns over almost half of her body. These injuries caused burns and scarring on her face, lips, chin, ears, chest, abdomen, legs, feet, arms, and hands, and she has already endured numerous surgical procedures to treat those injuries. According to Dr. Henderson, her future skin grafts will be performed by transplanting harvested skin from areas of her body which were not injured,

thereby causing even more scarring. Additionally, future skin grafts will become more difficult because the supply of undamaged skin available for the needed procedures will decrease with each new procedure. Dr. Henderson testified that because Dai'Jhnea was so young when she sustained her injuries, she will have more problems with skin contracture as she ages. This problem alone will require at least twenty more contracture release surgeries, with physical therapy following each surgery. Dai'Jhnea's head was so severely burned that she will never be able to grow hair in the scarred area of her scalp. Dai'Jhnea has an American Medical Association disability rating of sixty-five percent.

Dai'Jhnea's mother testified that her daughter still cannot move or use her right hand. Additionally, Dai'Jhnea cannot play outside, run, or even watch an outside event because of her condition. Her appearance has caused her difficulties in social development and she has had to change schools two times because of teasing by other children.

The jury awarded Dai'Jhnea general damages totaling $6,500,000.00. This total included $1,500,000.00 for scarring and disfigurement; $2,000,000.00 for disability; and $3,000,000.00 for past and future pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life. Considering the pain Dai'Jhnea has suffered, both mentally and physically, and the devastating impact that her injuries will have on her for the remainder of her life, we find no abuse of discretion in the jury's award.

### Dashawana's Injuries

Dashawana, who was seventeen at the time of the explosion and fire, sustained second and third degree burns over fifty percent of her body. She sustained extensive

damage to her face, arms, hands, thighs, knees, and calves, and her right ear was partially destroyed. Skin was harvested from her back for grafts, causing additional scarring. Some of her joints are contracted due to extensive scarring and do not function properly. She, too, underwent multiple surgeries and, according to Dr. Henderson, will need at least eight additional surgical skin grafts over the next eight years. Furthermore, when she reaches her mid-forties, she will need surgery for wound degeneration and breakdowns approximately every three years for the rest of her life. Dashawana is a Certified Nursing Assistant, but due to her injuries she cannot lift or transfer her patients. Dr. Henderson testified that she has an American Medical Association disability rating of forty-eight percent.

The jury awarded Dashawana general damages totaling $4,000,000.00. This total included $1,000,000.00 for scarring and disfigurement; $1,000,000.00 for disability; and $2,000,000.00 for past and future pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life. Considering Dashawana's extensive injuries and the impact they have had and will have on her life, we find the jury did not abuse its discretion in making this award.

*Marquetta's Injuries*

Marquetta was fifteen at the time of the explosion and fire. Dr. Henderson testified that she suffered second-degree burns to twenty percent of her body and third-degree burns to over five percent of her body. The injuries were to her face, neck, arms, both legs, and her left foot. The necklace and clothing she was wearing at the time of the explosion and fire, as well as the blanket wrapped around her, were burned into her body. The skin harvested from the tops of her legs for her two initial skin grafts caused permanent scarring on her legs. She also will need multiple

19

contracture release surgeries, skin grafts, and physical therapy. As is the case with the other burn victims, Marquetta is unable to be in the sun for any period of time. She also feels a social stigma from her injuries and testified that she is ashamed of her scars. According to Dr. Henderson, Marquetta has a twenty-one percent permanent partial impairment of her body.

The jury awarded Marquetta general damages totaling $1,250,000.00. This total included $500,000.00 for scarring and disfigurement; $250,000.00 for disability; and $500,000.00 for past and future pain and suffering, mental anguish and emotional distress, and loss of enjoyment of life. Considering the injuries Marquetta has suffered and will continue to suffer, we find no abuse of discretion in the jury's award.

**Consortium Claim**

As stated in *Morrison v. Kappa Alpha Psi Fraternity*, 31,805, p. 23 (La.App. 2 Cir. 5/7/99), 738 So.2d 1105, 1122, *writs denied*, 99-1607, 99-1622 (La. 9/24/99), 749 So.2d 634, 635, 99-1668 (La. 9/24/99), 747 So.2d 1120:

> Civil Code art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. Parents must prove, by a preponderance of the evidence, any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity. *Bell v. USAA Casualty Ins. Co.*, 30,172 (La.App.2d Cir. 01/21/98), 707 So.2d 102, *writs denied*, 98-0712, 98-0768 (La.05/08/98), 718 So.2d 433, 434; *Spears v. Jefferson Parish School Board*, 94-352 (La.App. 5th Cir. 11/16/94), 646 So.2d 1104.
>
> A child may sustain physical injury without necessarily causing his parents a loss of consortium. *Bell, supra.* Mental anguish suffered by the parents because of an injury to their child is not compensable in a loss of consortium claim. *Spears, supra*; *Simpson v. State, Department of Transportation and Development*, 636 So.2d 608 (La.App. 1st Cir. 1993),*writs denied*, 94-0042, 94-1005 (La.05/06/94), 637 So.2d 471, 472.

Thus, we must be careful to differentiate between that which is recoverable as an element of the consortium claim and that which is not recoverable absent the existence of a cause of action for individual mental distress under La.Civ. Code art. 2315.6 and the holding in *LeJeune v. Rayne State Branch Hospital*, 556 So.2d 559 (La.1990).

In the matter before us, it is abundantly clear that Mr. and Mrs. Joseph have suffered severe mental anguish because of the devastating and permanent damages to their daughter. However, their recovery must be based on the factors recited in *Morrison*. Dia'Jhnea was only thirteen months old when she sustained her injuries and, of the six factors recited in *Morrison*, only two apply to this litigation. Still, the effect of the loss of these particular relationship factors supports the jury award of $100,000.00 each to Mr. and Mrs. Joseph.

Not only did Dai'Jhnea's parents have to suffer the temporary physical loss of their child during the initial treatment for her injuries, and in doing so lost that ability to hold and comfort her during that period, but the societal and companionship relationship that would normally exist between a parent and child has been permanently destroyed. Dai'Jhnea cannot run, play outside, or even watch an outside event because of her damaged skin. That being the case, Mr. and Mrs. Jones will never experience the enjoyment of watching their daughter participate in the most basic activities such as an Easter egg hunt, cheerleading, or bike riding to name a few. In fact, they cannot even sit together outside and watch others participate in those activities. Furthermore, the parents now have the added burden of working tirelessly with Dai'Jhnea to assist her in overcoming her social development limitations, and continuously counseling her on how to address the thoughtless teasing of children her

age. With regard to the other applicable factor, the loss of performance of material services, almost all children help around the home in some small way. Whether it is to help wash dishes, sweep and dust, or take care of one's room, a child can contribute. In the case of Dai'Jhnea, it is clear that she will be severely limited in her abilities to contribute even the smallest assistance to her parents. These limitations are not something that will improve in the future—in fact the overall relationship will forever be constrained by her ongoing medical needs.

Considering the permanent and devastating effect of Dai'Jhnea's injuries on the parent/child relationship both initially and for the remainder of the parents' lives, we find no abuse of discretion in the jury's award to Mr. and Mrs. Joseph for their loss of consortium. *Youn*, 623 So.2d 1257.

### *Assignment of Error Number Four*

On June 18, 2008, in response to the plaintiffs' discovery requests, Centerpoint Energy provided the plaintiffs with a report in spreadsheet form addressing instances of natural gas usage at locked meters. On June 3, 2010, Centerpoint Energy provided the plaintiffs with a supplemental report. In its final assignment of error, Centerpoint Energy asserts that the trial court erred in allowing the plaintiffs to introduce the 2008 report into evidence and in refusing to allow it to introduce the 2010 report into evidence.

### *2008 Report*

The specific discovery request addressed by the 2008 report asked Centerpoint Energy to state "[t]he number of occasions and the circumstances of the occasions in which natural gas provided by Centerpoint was turned on without authority after a blind plate was installed." The report provided is entitled "Gas Usage from Locked

Meters," and the spreadsheet lists over 18,000 abnormal meter readings and potential instances of fraud in Centerpoint Energy's South Louisiana area from July 2, 2004, forward.

On July 1, 2010, Centerpoint Energy filed a motion in limine seeking to exclude this 2008 report from evidence at trial. In its motion, Centerpoint Energy questioned the relevance of the report because it contained only events subsequent to the explosion and fire at issue in this litigation, and because the plaintiffs had failed to show that there existed a substantial similarity between the subsequent events and their accident. Centerpoint Energy further asserted that the report contained many factual inaccuracies. The trial court rejected Centerpoint Energy's motion in limine before the trial on the merits began and overruled its objection to the introduction of the report when the plaintiffs offered it at trial.[8]

A trial court's decision to admit or exclude evidence is governed by the Louisiana Code of Evidence, and generally "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." La.Code Evid. art. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Whether evidence is relevant is within the discretion of the trial court, and its ruling will not be

---

[8]When Centerpoint Energy first objected during trial, the trial court initially rejected its argument that the flawed nature of the report precluded its introduction but sustained its objection based on the lack of a predicate to demonstrate that the reported incidents were similar to the issue at trial. However, after John Edward Eades, the operations supervisor at Centerpoint Energy, testified as to the origin and interpretation of the report, the trial court reversed its position and allowed the report to be introduced.

23

disturbed on appeal in the absence of a clear abuse of that discretion. *Quibodeaux v. Med. Ctr. of Sw. La.*, 97-204 (La.App. 3 Cir. 3/6/98), 707 So.2d 1380, *writ denied*, 98-926 (La. 5/15/98), 719 So.2d 465.

Centerpoint Energy asserts on appeal that because the incidents portrayed by the 2008 report occurred after the accident at issue in this litigation, it does not establish Centerpoint Energy's duty at the time of the plaintiffs' injuries. Specifically, Centerpoint Energy asserts that evidence of conditions after the accident at issue would be admissible only if there were evidence presented identifying the entries on the report and explaining their similarity to the accident at issue in this case.

In making this argument, Centerpoint Energy relies on *Lee v. K-Mart Corp.*, 483 So.2d 609 (La.App. 1 Cir. 1985), *writ denied*, 484 So.2d 661 (La.1986), wherein the first circuit concluded that evidence of foreign substances and objects on a store's floor after an accident occurred was admissible to show that the store's maintenance and inspection procedures were ineffective so long as there was evidence that the store's floor maintenance and inspection procedures were the same at the time of the accident and the time of the subsequent investigations; *Johnson v. Insurance Co. of North America*, 360 So.2d 818 (La.1978), wherein the supreme court concluded that photographs of protruding cans on a grocery store shelf taken a year after the accident at issue did not establish by a preponderance of the evidence that the cans were improperly stacked before the accident; and *Stewart v. Great Atlantic & Pacific Tea Co.*, 94-1592 (La.App. 4 Cir. 3/16/95), 657 So.2d 1327, wherein the fourth circuit concluded that the trial court did not err in excluding videotape and testimony that

24

would have established the store's conditions and display configurations at various times after the relevant accident.

The matter before is distinguishable from the authority cited by Centerpoint Energy because, although the data in the 2008 report covered a span of time beginning after the explosion and accident at issue in this litigation, Mr. Eades testified that Centerpoint Energy had followed the same procedures when locking off gas meters since 2001. Given that the plaintiffs established through Mr. Eades' testimony that the efforts to lock meters were subject to the same company procedures before July 2, 2004, as after that date, we find that the trial court did not abuse its discretion in allowing the plaintiffs to introduce the 2008 report into evidence.

### 2010 Revised Report

On April 23, 2010, Centerpoint Energy produced a revised version of the 2008 report and attempted to add two new witnesses, Nancee Chester, a Centerpoint Energy systems analyst, and Michael Maxwell, a Louisiana Centerpoint Energy employee. On May 3, 2010, the plaintiffs filed a motion seeking to exclude the 2010 report and the new witnesses. At a June 3, 2010 meeting scheduled to review the new report, Centerpoint Energy withdrew the April 2010 report because it contained errors and submitted another revised report. On July 12, 2010, the trial court entered an order granting the plaintiffs' motion in limine and excluding Centerpoint Energy's April 23, 2010 and June 3, 2010 reports as being "untimely and unreliable" and ordering that Ms. Chester would be "excluded from offering testimony relative to compilation and significance of these reports at trial."

Centerpoint Energy argues that the trial court erred in excluding its June 3, 2010 revised report and testimony related to the report. However, Centerpoint

Energy failed to proffer the 2010 report or the excluded testimony of Ms. Chester. "[I]f a party fails to proffer excluded evidence, an appellate court cannot analyze it and its admissibility, and that party is precluded from complaining of the excluded testimony." *Whitehead v. Kan. City S. Ry. Co.*, 99-896, p. 11 (La.App. 3 Cir. 12/22/99), 758 So.2d 211, 218-19, *writ denied*, 00-209 (La. 4/7/00), 759 So.2d 767. As the defendants failed to proffer the excluded evidence, we will not address this issue on appeal.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects.[9] We assess all costs of this appeal to the defendants, Centerpoint Energy Entex; Centerpoint Energy Resources Corporation; Centerpoint Energy Marketing, Inc.; Entex Gas Resources Corporation; Centerpoint Energy Gas Services, Inc.; Centerpoint Energy Gas Transmission Company; and Reliant Energy Resources Corporation.

**AFFIRMED.**

---

[9]We address the damage awards to Dai'Jhnea Joseph, Steven Joseph, and Constance Joseph in the matter consolidated herewith, *Joseph v. Centerpoint Energy Entex*, 11-3 (La.App. 3 Cir. ___/___/___), ___ So.3d ___.