# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 22-749

JENA ROUGEAU

VERSUS

HOSPITAL SERVICE DISTRICT No. 2
OF BEAUREGARD PARISH, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2017-0348
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

Craig J. Sabottke
Thomas H. Wartelle
Courtenay S. Herndon
Watson, Blanche, Wilson & Posner
505 North Boulevard
Baton Rouge, LA 70802
(225) 387-5511
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Hospital Service District No. 2 of Beauregard Parish
    West Louisiana Health Services, Inc. d/b/a Beauregard Memorial
    Hospital

Jackson T. Brown
David H. Hanchey
Hannah E. Mayeaux
The Townsley Law Firm, LLP
3102 Enterprise Boulevard
Lake Charles, LA 70601
(337) 478-1400
COUNSEL FOR PLAINTIFF/APPELLEE:
    Jena Rougeau

Jason E. Wilson
Galloway Johnson Tompkins Burr & Smith
3861 Ambassador Caffery Parkway, Suite 300
Lafayette, LA 70503
(337) 735-1760
COUNSEL FOR INTERVENOR/APPELLEE:
    New Hampshire Insurance Company

**KYZAR, Judge.**

In this personal injury claim, the defendants, Hospital Service District No. 2 of Beauregard Parish and West Louisiana Health Services, Inc. d/b/a Beauregard Memorial Hospital, appeal from the trial court judgment granting a judgment notwithstanding the verdict and awarding damages in favor of the plaintiff, Jena Rougeau. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On April 17, 2017, Jena Rougeau (Plaintiff) filed a petition for damages against Hospital Service District No. 2 of Beauregard Parish and West Louisiana Health Services, Inc. d/b/a Beauregard Memorial Hospital (referred to collectively as "BMH"), alleging that her right shoulder was injured when David Harless, an emergency room nurse, unexpectedly stopped the stretcher she was pulling with her right arm. The alleged incident occurred on June 25, 2016, when Plaintiff, an emergency medical technician, and her partner, a paramedic (referred to collectively as EMTs),[1] were moving a patient down the hallway of the emergency room towards the nurse's station. Plaintiff, who was in front of the stretcher, was pulling it with her right arm outstretched behind her as she walked towards the nurse's station. Her partner was pushing the stretcher from behind, near the patient's head.

Plaintiff alleged that her injury occurred when Nurse Harless "[s]uddenly and without warning," "grabbed [the stretcher] from the rear, causing it to immediately stop[,]" which caused her "right arm to violently jerk[.]" She claimed that Nurse Harless's act of stopping the stretcher was a breach of his duty because "he negligently interfered with the transfer of a patient who was on an ambulance stretcher that was still under the care and control of [Plaintiff] and her co-worker."

---

[1] Plaintiff and her partner were employed by Acadian Ambulance Services, Inc. (Acadian Ambulance).

She further alleged that BMH was liable for Nurse Harless's actions under the doctrine of respondeat superior.

BMH answered Plaintiff's petition, denying her claims and asserting the affirmative defenses of comparative and third-party fault.[2] New Hampshire Insurance Company, Acadian Ambulance's workers' compensation insurer, intervened in the suit to recover monies paid to Plaintiff in workers' compensation benefits.

On January 22, 2021, Plaintiff filed a motion for partial summary judgment on the issue of BMH's liability. BMH filed its own motion for summary judgment on January 25, 2021, asserting that there were no genuine issues of material fact as it neither owed nor breached any duty owed to Plaintiff. At the close of the March 5, 2021 hearing, the trial court orally denied both motions.

The matter proceeded to a jury trial on January 24, 2022 and January 26, 2022, at the conclusion of which the jury rendered a nine to three verdict, finding that Nurse Harless was negligent but that his negligence was not a cause-in-fact of Plaintiff's injuries. Accordingly, judgment was rendered by the trial court on February 15, 2022, in favor of BMH, dismissing all of Plaintiff's claims against it with prejudice. Thereafter, Plaintiff moved for a judgment notwithstanding the verdict (JNOV), which BMH opposed. At the close of the April 14, 2022 hearing on the motion, the trial court orally granted a JNOV in favor of Plaintiff. It further allowed each party time to file memorandums on the issue of quantum. After these were received, the trial court took the issue of quantum under advisement.

---

[2] BMH's May 2, 2017 answer only listed itself as the defendant in the matter. No mention was made of either Hospital Service District No. 2 of Beauregard Parish or West Louisiana Health Services, Inc.

2

On June 10, 2022, the trial court rendered written reasons for judgment, awarding damages to Plaintiff as follows: $42,626.48 in past medical expenses; $60,000.00 in past lost wages; $160,000.00 in past pain and suffering; $25,000.00 in future pain and suffering; $40,000.00 in past mental anguish; and $36,000.00 in loss of enjoyment of life. A written judgment granting Plaintiff's motion for JNOV and awarding her a total of $363,626.48 in damages was rendered by the trial court on July 5, 2022. It is from this judgment, as well as the February 15, 2022 judgment on the jury verdict, that BMH has suspensively appealed.

On appeal, BMH asserts six assignments of error, as follows:

1. The jury erred in finding that [BMH], through its employee, David Harless, was negligent in this incident as Plaintiff, Jena Rougeau, presented no evidence or testimony at trial that [BMH] was negligent.

2. The trial court erred in granting the JNOV on the issue of causation, as [BMH] presented more than sufficient evidence for a reasonable jury to conclude that David Harless's negligence did not cause Jena Rougeau to suffer a labral tear.

3. [The trial court] improperly substituted [its] own assessment of the credibility of the lay and expert witnesses in place of the jury in determining that plaintiff was entitled to a [JNOV].

4 The trial court erred in excluding [BMH's] causation expert, Dr. Nick Hatzis.

5. [The trial court] erred in awarding an excessive amount of damages to plaintiff upon granting the [JNOV].

6. [The trial court] erred in not applying the statutory cap on damages upon granting the [JNOV].

## OPINION

### *Assignment of Error Number Four*

We first consider BMH's allegation that the trial court erroneously excluded the testimony of its causation expert, Dr. Nick Hatzis, as a decision on this issue

3

could impact the standard of review applicable to the other issues raised on appeal. *Said v. Federated Rural Elec. Ins. Exch.*, 21-78 (La. 4/20/21), 313 So.3d 1241.

A trial court has wide discretion in determining what witnesses, expert or lay, are allowed to testify at trial. La.Code Civ.P. art. 1551; *Baker v. Baker*, 09-507 (La.App. 3 Cir. 11/4/09), 27 So.3d 958, *writ denied*, 09-2640 (La. 2/12/10), 27 So.3d 850. Further, we will not disturb the trial court's vast discretion regarding the admissibility of expert testimony absent a finding of clear error. *See Mistich v. Volkswagen of Germany, Inc.*, 95-939 (La. 1/29/96), 666 So.2d 1073, *on reh'g on other grounds*, 95-939 (La. 1/29/96), 682 So.2d 47.

We note that at the March 5, 2021 pre-trial hearing, the trial court ruled that Dr. Hatzis, an orthopedic surgeon, could testify as an expert subject to a later *Daubert* challenge. However, it ordered that his deposition be scheduled within two weeks so Plaintiff could depose him. Despite the parties' attempt to comply with the trial court's directive, Dr. Hatzis left the deposition an hour after it started and refused any further participation.

Thereafter, during a March 30, 2021 hearing, the trial court asked BMH to contact Dr. Hatzis about finishing his deposition the next day and about whether he would honor a subpoena to testify at trial. Following a recess, BMH advised the trial court that Dr. Hatzis was unavailable to complete his deposition. Its counsel further advised the trial court, "To be completely candid with the Court I think it's doubtful that he will honor a subpoena to appear for trial." Based on this information, the trial court orally excluded Dr. Hatzis's testimony from being presented at trial. No contemporaneous order was presented or signed in connection with this ruling. Although BMH did not seek writs in connection with the ruling, it subsequently submitted a written judgment approximately one year later, on May 2, 2022, which the trial court denied with the following hand-written notation: "On March 30, 2021,

4

an interlocutory order was issued. No request was made pursuant to LA CCP Art. 1914."[3]

Considering Dr. Hatzis's refusal to cooperate during his deposition and his further refusal to cooperate at trial as signified by BMH at the March 30, 2021 hearing, we find no abuse of discretion in the trial court's exclusion of his testimony at trial. Accordingly, we find no merit in this assignment of error.

### *Assignments of Error Numbers One, Two, and Three*

In these three assignments of error, BMH asserts that the jury erred in finding Nurse Harless negligent, that the trial court erred in granting a JNOV on the issue of causation, and, in doing so, it improperly substituted its own assessment of the credibility of the lay and expert witnesses in place of the jury's assessment.

A claim of actionable negligence arises from La.Civ.Code art. 2315(A), which provides, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Additionally, La.Civ.Code art. 2316 provides, "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." Moreover, an employer is liable for the damage caused by its employees "in the exercise of the functions in which they are employed." La.Civ.Code art. 2320.

In order to prove negligence and liability therefore, the plaintiff bears the burden of proving the defendant's liability through application of the duty-risk analysis. This analysis consists of five separate elements: 1) whether the defendant had a duty to conform his conduct to a specific standard; 2) whether the defendant

---

[3] Louisiana Code of Civil Procedure Article 1914(B) provides:

The interlocutory judgment shall be reduced to writing if the court so orders, if a party requests within ten days of rendition in open court that it be reduced to writing, or if the court takes the interlocutory matter under advisement. The clerk shall mail notice of the subsequent judgment to each party.

5

breached that duty; 3) whether the defendant's conduct was a cause-in-fact of the plaintiff's injury; 4) whether the defendant's conduct was the legal cause of the plaintiff's injury; and 5) whether the plaintiff suffered actual damages. *Jones v. Centerpoint Energy Entex*, 11-2 (La.App. 3 Cir. 5/25/11), 66 So.3d 539, *writ denied*, 11-1964 (La. 11/14/11), 75 So.3d 946. As all five elements are necessary to prove liability, the plaintiff's failure to prove any one element will defeat a finding of liability. *Id.*

Whether a party is negligent is a factual determination, and it is well settled that a jury's finding of negligence will not be reversed on appeal unless that finding is manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Louisiana Code of Civil Procedure Article 1811(B) provides that upon the filing of a motion for JNOV, "[i]f a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict." A JNOV may be granted "on the issue of liability or on the issue of damages or on both issues." La.Code Civ.P. art. 1811(F).

Although La.Code Civ.P. art. 1811 does not specify the grounds on which a JNOV may be granted, the criteria to be considered in relation to the motion were set forth by the supreme court in *Scott v. Hospital Service District No. 1 of Parish of St. Charles*, 496 So.2d 270 (La.1986). The motion will be granted "'only when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable [persons] could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.'" *Id.* at 274 (quoting *Robertson v. Penn*, 472 So.2d 927, 929 (La.App. 1 Cir.), *writ denied*, 476 So.2d 353 (La.1985)). However, the motion will be denied if the opposing evidence is "of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions[.]" *Id.*

6

In deciding whether to grant a JNOV, the trial court "should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party." *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). "This rigorous standard is based upon the principle that '[w]hen there is a jury, the jury is the trier of fact.'" *Boothe v. Dep't of Transp. and Dev.*, 18-1746, p. 7 (La. 6/26/19), 285 So.3d 451, 456 (alteration in original) (quoting *Scott*, 496 So.2d at 273).

> In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. *Anderson*, 583 So.2d at 832.

*Joseph v. Broussard Rice Mill, Inc.*, 00-628, p. 5 (La. 10/30/00), 772 So.2d 94, 99.

It is only when the jury verdict is set aside under this strict JNOV standard that the trial court becomes the trier of fact. *Anderson*, 583 So.2d at 832.

The testimony and evidence presented at trial on the issues of negligence, causation, and damages are summarized as follows:

In outlining the procedure followed when transporting a patient to an emergency room, Plaintiff testified that she and her partner would alert the hospital as to their estimated time of arrival and the patient's status as either critical or non-critical. Upon arrival, they would proceed with the patient to the nurse's station, where they provided a full report on the patient and obtained a room assignment. When moving the patient on a stretcher, Plaintiff normally pulled from the foot of the stretcher, while her partner pushed from the head of the stretcher. Once the patient was in a room and transferred to the room's bed, Plaintiff would return the

7

stretcher to the ambulance, while her partner remained with the patient until he obtained the nurse's signature indicating that care of the patient has been transferred to the emergency room personnel. Acadian Ambulance remained in charge of the patient until this official transfer occurred.

Plaintiff testified that other than assisting with the transfer of a heavy patient from their stretcher to the bed, the only time BMH's personnel had assisted them prior to the transfer of care was when they transported a dying gun-shot victim to the emergency room. In that instance, they opened the emergency room doors, directed them to a room, and assisted them in transferring the patient to the bed. She said that excluding a patient, Acadian Ambulance's stretcher and accompanying monitor weighs approximately 150 pounds.

On the night in question, Plaintiff testified she and her partner entered the emergency room and were proceeding with their patient towards the nurse's station. The incident at issue occurred when the stretcher stopped unexpectedly as she was towing it down the hallway with her right arm, which was outstretched behind her. The sudden stoppage of the stretcher pulled her arm backwards, and she heard a pop in her right shoulder and felt immediate pain. Plaintiff stated that she turned around and saw her partner talking to Nurse Harless, who her partner said had stopped the stretcher. She stated that her partner asked if she was okay and demonstrated what had happened, as evidenced by video footage of the incident. She said that her right shoulder was hurting when the video showed her using both arms to move the stretcher out of the middle of the hallway. Plaintiff testified that she was crying due to pain when the video showed her rubbing her eyes. While she agreed that Nurse Harless's act of stopping the stretcher was not aggressive or violent, she said that it felt hard and fast.

8

Plaintiff denied that Nurse Harless said anything prior to stopping the stretcher. However, she admitted that she heard someone behind her ask where they were going. She said that she responded to this question by saying "we are going to the [n]urse's station." Although she did not know if Nurse Harless asked the question, she stated that she assumed that he did. She said that her act of pointing with her left arm towards the nurse's station, as shown in the video, could have been in response to this question.

Plaintiff said that shortly after the incident, the video showed her partner walk into room six with Nurse Harless and then walk back to the nurse's station. Nurse Harless also exited the room, then grabbed the stretcher and began pulling it into room six. She said that she guided the foot of the stretcher with her left arm. However, once she entered the room, she noticed that the room was dirty, and the bed was unmade. Plaintiff testified that when her partner reentered the room, he noticed a yellow fluid on the floor. At that point, he determined that the room was not ready for the patient, and they moved the patient back to the hallway to await another room assignment. She stated that she also saw what appeared to be urine on the floor. They waited with the patient in the hallway for approximately thirty minutes while the room was cleaned. She claimed that the patient's transfer of care did not occur until the room was cleaned, and the patient was transferred to the room's bed.

Plaintiff testified that after she and her partner returned to the ambulance, he reported her injury to their supervisor. She said that the video of her exiting the emergency room showed her holding her right arm due to pain. It also showed her partner checking her arm and then grabbing the head of the stretcher as though to demonstrate how it was stopped. Since she was unable to finish her shift, her partner drove them back to their home station in Moss Bluff, where she reported her injury

9

to her supervisor, Carl Gautreaux. Mr. Gautreaux then drove her to Business Health Partners (Business Health) in Sulphur, where she provided a urine sample and filled out an incident report. She described the incident in the report, as follows: "Walked into [BMH] with a patient on the stretcher. I was at the feet end with my right arm pulling when I felt a tug come from the head end of the stretcher. I immediately felt a pop and pain on my right shoulder and upper arm."

Plaintiff provided the following description of the incident to Business Health: "Pt said she was walking into hospital and had (R) arm on bar of stretcher and she felt a jerk on the stretcher and heard a pop felt pain from shoulder to elbow."[4] Business Health x-rayed her right shoulder, checked her range of motion, and instructed her to treat her shoulder with rest, ice, and ibuprofen. She was placed on light duty, which Acadian Ambulance was unable to accommodate. Plaintiff returned to Business Health once a week over the next three weeks. As her shoulder had improved by July 15, 2016, she was released without any work restrictions.

Upon her return to work, Plaintiff immediately began experiencing pain with lifting such that her partner took over a lot of her duties. She said that he used a slide board when transferring patients from the stretcher, while she used her left arm to "make sure they stayed steady." When she sought treatment from Hunter McGuire Medical Center six weeks later, she was restricted to light-duty work pending follow up with an orthopedic surgeon.

Plaintiff testified that she next saw Dr. Brett Cascio, an orthopedic surgeon, who restricted her from working. She denied telling Dr. Cascio that she had suffered a new injury after she returned to work. She said that had this occurred, Acadian Ambulance would have required her to provide a urine sample and fill out another

---

[4] The handwritten statement, contained on page 25 of Joint 2, was illegible as it was too faded out to read.

10

incident report. Plaintiff testified that she was given a steroid shot and that her pain had somewhat improved after six weeks of physical therapy. Due to her continued pain, Dr. Cascio recommended an MRI, after which he recommended arthroscopic surgery to repair her torn labrum and rotator cuff.

Plaintiff described the surgery as extremely painful, and her recovery as rough. Pain medication was delivered into her shoulder through a tube for three days following the surgery. She also used an ice machine for her shoulder for approximately one week. Her arm was kept in a sling for six weeks as she was unable to move it. Physical therapy began three days after her surgery to prevent her shoulder joint from freezing up. She stated that although therapy was rough, it helped her to an extent as she could now lift approximately forty-five pounds.

Plaintiff stated that she was in pain from the time of the incident through the date of surgery. Her shoulder popped every day, and it made it hard for her to find a comfortable position while sleeping. She was unable to do much housework or cooking, and she had to become proficient with her left hand. She stated that although surgery helped, she still experienced a nagging pain as well as occasional popping in her shoulder. Plaintiff testified that she was told by Dr. Cascio that it would take time for her shoulder to become stronger, and he told her to continue her home regimen of ibuprofen, ice, exercise, and stretching. She said that she still follows this regimen to manage her pain. She stated that cold weather causes her shoulder to become stiff and hurt, and she still has trouble picking up her fiancé's young children. She said that her fiancé helps by massaging her shoulder.

Even though Dr. Cascio released her without any work restrictions, Plaintiff did not return to Acadian Ambulance. She had missed two years of work by that time, and although she was still employed by Acadian Ambulance, she "knew going back to work I wouldn't be able to lift and I would risk my partner, me, a patient, I

11

didn't want to do that." She did not think she could pass Acadian Ambulance's lift test, which required her to dead lift 175 pounds, carry a large medic bag and monitor up a flight of stairs, and perform CPR for approximately one minute while maintaining a certain heart rate. Approximately two weeks prior to her release, she began working part-time for AT&T, selling cell phones.

Plaintiff testified that she intended to return to Acadian Ambulance as soon as she could satisfy the job requirements. At trial, she said that she did not think she could pass the lift test. When asked how this made her feel, she stated, "Awful. Mad[.] Sad." She explained, "I went to school twice to pass it, and I wanted to help people and now I'm just trying to figure out a new way to do that, but I haven't. And I miss it, it was a very rewarding job." She said that being an EMT brought joy into her life. Plaintiff stated that she became frightened when she felt pain in her shoulder while lifting a heavy object. She said, "I just – if I pick something up, I can feel it so I get scared and I then just immediately put it down."

Regarding the effect of her injury on her daily life, Plaintiff testified:

> So, day to day – immediately when I feel pain it's just – it brings me back to that moment and I get upset. And when I have to tell my kids, I'm sorry I can't pick you up right now it hurts too bad. Or they will play outside and they will be like, hey come play ball. And I'm just like – I try with my left arm, but that's silly. It's hard because that's all I wanted to do. I still haven't figured out how to help people in that way. I've tried. I even applied one time to the hospital as just like a medical tech, you just document [sic]. And they said that I wasn't qualified, it's just hard. It's all I wanted to do. And I don't want to risk anybody else getting hurt, so I'm very aware of what I can and can't do and I'm very aware of other people around me. Like the kids. I don't want to drop them, or I don't want it to fall if I'm holding something heavy. So, it's just hard.

Plaintiff has received no treatment for her shoulder since her release by Dr. Cascio. As she could not return to Acadian Ambulance, she worked as a sales representative for AT&T for approximately two years, as a food-delivery driver for Waiter for approximately six months, and as a stay-at-home mom for her fiancé's

12

three young children. She started her current job as a bank teller with JD Bank approximately four months prior to trial. Plaintiff's W-2s from Acadian Ambulance established that she earned $27,914.85 in 2014, $29,957.47 in 2015, and $23,052.48 for the partial year she worked in 2016. She stated that she expected to earn $30,000.00 per year with Acadian Ambulance. At the time of her injury, she was earning $13.15 per hour.

Plaintiff denied having any previous shoulder injury prior to this incident. She admitted that she suffered a slight back injury while lifting a patient out of a recliner in 2015. She further admitted that she was diagnosed with anxiety and depression prior to this incident and that she takes medication for her anxiety.

Lacie Heinen, Plaintiff's long-time friend, knew about the incident, and when she saw Plaintiff several days later, she was in pain and barely able to move her arm. She claimed that Plaintiff's injury put her in a "really deep depression" and "took away the career that she worked really hard for." She further testified, "we lived together when she was studying for EMT school and she studied hard. She worked hard and she loved her career, loved her job. Once the incident happened, she couldn't perform anymore and wasn't able to do that." Ms. Heinen said that Plaintiff lost confidence in herself after her injury because "she didn't know what kind of job she could even hold, because – you know, she was waiting to be approved for surgery and she was still in a lot of pain. She became a different person for a little while." She stated that Plaintiff was in great physical condition and very active prior to this incident. She said that Plaintiff helped raise her children, but that subsequently she was unable to pick them up and was very careful about moving her arm.

Dr. Brett Cascio testified as Plaintiff's treating physician, as well as an expert in orthopedic surgery. It was his opinion, based on the video and the history related by Plaintiff, that this incident caused a labral tear in her right shoulder. Although he

13

admitted that the video of the incident was not impressive at first glance, he said that "when you break it down and you see her reaction, it's more probable than not that this is the situation that either caused or [exacerbated] a shoulder problem." He further said that his opinion was corroborated by Plaintiff's incident report, as well as the histories she gave both him and Business Health.

According to Dr. Cascio, the position of Plaintiff's right arm, outstretched behind her as she pulled the stretcher, rendered her shoulder vulnerable to injury because "the only connection between the three hundred plus pound stretcher" and her body was "the shoulder joint. And so, if the shoulder is torqued, twisted and pulled, that's basically how a labrum tear happens." He said that this was especially true when the stretcher was grabbed unexpectedly from behind. He opined that the movement of her shoulder when this occurred was "more than enough to injure a labrum." Dr. Cascio further pointed out that Plaintiff began guarding her shoulder right after the incident by bracing her right arm against her side. Although he acknowledged that she used both arms to move the stretcher out of the middle of the hallway, he disagreed that the movement exerted more force on her shoulder than the incident in question:

> I don't think so, a couple of reasons why. Two arms – one arm is supporting the other one so we don't know how much she is pulling or pushing with one arm versus the other. And she is doing it, so she expects what's happening to her shoulder versus an unexpected pull or twist.
>
> . . . .
>
> . . . If you expect to lift three hundred (300) pounds pressing, you can take [sic]. But if suddenly [sic] run up to you and pull your arm, it's a different kind of energy, but if you're not expecting it your risk of injury is still – you have a risk of injury because your muscles aren't ready to control your joint and basically splint your joint and hold it still while the force is being applied.
>
> . . . .

14

But, I mean, it could work another way as well, like in a car accident. If you grab your steering wheel and you see it coming and you tense up, that can work in counter effect and hurt your shoulder also. So you can get hurt in [an infinite] amount of ways with [infinite] amount of energy applied, twisting applied to a joint, especially a shoulder.

Dr. Cascio testified that after Plaintiff and her partner exited the hospital, the video appeared to show her partner demonstrating the manner in which the stretcher was stopped by Nurse Harless. At the time, Plaintiff was rubbing her shoulder and testing its range of motion. He said that nothing in the video led him to think that her shoulder was no longer hurting.

When asked if Nurse Harless's act of grabbing the stretcher was reasonable, Dr. Cascio testified:

If I was the EMT or as a doctor pushing or pulling a stretcher, I think a verbal interaction would be better first than just grabbing or pulling the stretcher. The situation could be different sometimes, like it could be a hectic ER situation where there are patients everywhere and emergencies are happening where adrenaline is rushing, but this seemed like a calm quite [sic] hallway. So, if I was one of the EMTs or I was moving a stretcher myself as a physician, I would think somebody would just say, room three. Or something to that affect [sic].

Dr. Cascio stated that Business Health's restriction of Plaintiff to light-duty work rendered her unfit to perform the heavy-duty work required of an EMT. He also said that it was reasonable for Plaintiff to return to work when her shoulder improved. Despite this improvement, he opined that her labrum was still torn:

The way I explain it to my patients is a labrum tear – similar to a meniscus tear in the knee, a labrum tear is like a hang nail. So sometimes you don't know that you have a hang nail, but then it catches on something and you feel it because it's attached to nerves and when it pulls you feel it. It can lay dormant and feel better if you're not testing it then you won't even know it's there. But you pull or push it a certain way and then you feel it.

He further explained that it was typical for a person treated conservatively for a torn labrum to experience shoulder pain after returning to work. He said that fifty percent

15

of labral tears respond to non-operative treatment; thus, not all labral tears require surgery.

When he first saw Plaintiff on October 6, 2016, Dr. Cascio noted that after six weeks of treatment, she "went back to work and then re-injured her shoulder." He explained that this meant that "basically her shoulder hurt, it felt better, she tried to go back to work and then rehurt it." It was his opinion that Plaintiff's labrum was torn before her return to work. He diagnosed her with a labral tear after feeling a pop in her shoulder while checking her range of motion. He explained that "if you feel a pop in the shoulder of a younger person it is very commonly [a] labral tear."[5]

Although the report from the December 20, 2016 MRI found no glenoid labral tears in Plaintiff's shoulder, Dr. Cascio disagreed with this finding based on her history and physical exam. He explained that approximately five percent of labral tears are missed because an MRI is basically "a two-dimensional black and white picture of a three-dimensional multicolored thing[,]" that "measures the water content of tissue and [they are] not always positive." He further stated:

> The other problem with the MRI is that it's not dynamic, meaning the – your shoulder is basically [staying] still, usually at your side while you're getting [an] MRI, well that's not when your shoulder hurts with a labral tear. That's actually where you put your shoulder to hold it still. When your shoulder hurts when your arm goes away from your body but that's not how it usually is in an MRI. You can take an MRI like that and you can increase the sensitivity, being able to pick up tears. But that is torture to make someone sit in an MRI with their arm up above their head if they have a labral tear. So, we don't do that very often. So, MRIs are more a guide for a shoulder surgeon to give them an idea of what they are dealing with. . . . [B]ut the MRI is not the end all. And I get negative MRI readings often that I prove wrong in surgery, I do this all the time. And sometimes I can actually over read the MRI and see a tear and I will call [r]adiologist and have them change their reading. Not that it's their fault and not that they made a mistake, but this is what I do all day long and I get to corollate – [r]adiologist doesn't get the benefit of the history and the physical exam. I get the benefit of the patient being in front of me with the history and the physical exam and to put all the pieces of the puzzle together.

---

[5] Plaintiff was twenty-four years old at the time of the incident.

Dr. Cascio's pre-operative diagnosis for Plaintiff was a labral tear; however, that diagnosis changed following Plaintiff's January 22, 2018 arthroscopic surgery to labral tear, rotator cuff tendinitis, acromioclavicular arthrosis, and biceps tendinitis. In addition to repairing Plaintiff's labrum, he also performed a biceps tenodesis, a subacromial decompression and bursectomy, and a distal clavicle excision. Dr. Cascio felt that Plaintiff's surgery was successful and that she had recovered well from the surgery. He stated that the normal recovery from this surgery requires the patient's arm to remain in a sling for four to six weeks, after which they undergo three to six months of physical therapy.

Dr. Cascio testified that when Plaintiff was released six months post-surgery, her pain had decreased significantly, her range of motion had improved, and she was able to lift forty-five pounds. Although he released her without any work restrictions, she still could not fulfill the heavy-duty job requirements of an EMT. Dr. Cascio expected Plaintiff to regain eighty percent of her range of motion in the future. He further expected her to experience "[a]ching, stiffness, some weakness, she was at increased risk compared to the general population of something [happening] to her shoulder but it – I don't expect something to happen to her shoulder." Although she might require future surgery to smooth out her labrum, he thought it unlikely.

Nurse Harless, a registered nurse, was the triage nurse at the time of the incident. He was aware that the patient was being transported to the emergency room, and he volunteered to prepare room six prior to the patient's arrival, as it was the only room available. As the EMTs were pushing the patient down the hallway, the video showed him retrieving linen from a blanket warmer located in the hallway. Nurse Harless testified that he tried to tell the EMTs that the patient was going to room six, but when they kept walking, he "reached out and tapped on the handle and

17

told them again that we were going over here." He stated that when the stretcher stopped, he "went into room six or went towards room six and made sure they knew we are going in here." However, during his deposition, he said that the only thing he said prior to tapping on the stretcher was "hey." He further stated during his deposition that he said, "where are y'all going?" at approximately the same time that he tapped on the stretcher. He denied hearing Plaintiff's shoulder pop.

Nurse Harless claimed that he learned of Plaintiff's injury later when her partner said she would have to check into the emergency room. Otherwise, he spoke very little to her and never noticed her crying. He said he saw Plaintiff at one point holding her arm, and he asked her if she needed to see the doctor. Nurse Harless denied that he had acted negligently or unreasonably during this incident, and he denied that he grabbed the stretcher. While he acknowledged that he touched the stretcher with his left hand, he denied that he grabbed it as he did not drop the linens he was holding in that hand. However, he admitted that his hand remained in contact with the stretcher after he tapped it.

Nurse Harless testified that after the incident, he went into room six and then exited the room. He is shown in the video pulling the stretcher into the room. He admitted that Plaintiff did not use her right arm during this maneuver. He stated that the patient was then moved out of the room when Plaintiff's partner saw a biohazardous substance on the floor and refused to transfer the patient to the room's bed. The patient was not transferred to the bed until the room was cleaned by housekeeping. He said that while he assisted with the transfer, he was not aware of Plaintiff's actions. However, he admitted that he did not see her lift the patient during the transfer.

Nurse Harless was not aware of any "policy or procedure that says [sic] can't touch somebody's stretcher." However, he stated that following this incident, his

18

supervisor, George Basco, "made a general comment about what he thought he knew" and told them not to touch any other party's stretcher. He claimed that this was Mr. Basco's "all-around fix for the [situation]" rather than BMH's policy. As to whether it was a good idea to suddenly stop a stretcher being pulled in the manner Plaintiff was pulling this stretcher, he first agreed that it was probably not a good idea, but then stated, "It depends on the circumstances." When asked whether it was a good idea to redirect a stretcher pulled in this manner, he stated, "I don't know[,]" but then later testified, "Again, it depends on the circumstances."

Nurse Harless was familiar with BMH's policies and procedures regarding the handling and exchange of emergency-room patients, as well as the term "transfer of care." This, he acknowledged, referred to the exchange of a patient between EMTs and emergency room personnel. He agreed that communication is an important component of transfer of care. He said, "Well, I think communication is important, whether it was received or not, I don't know." Nurse Harless further testified that he was not familiar with any safety rules that required an emergency room nurse to act reasonably and communicate effectively in order to prevent injury to others.[6] Although he thought the rules were reasonable, he assumed they were made up as they contained the word "must," whereas in hospital policies "there is always an exception to a policy that's written and with exceptions. This rule says there is no other option."

Nurse Harless acknowledged that an electronic document is signed by emergency room personnel indicating their receipt of a patient transported to the emergency room by EMTs. This document completes the transfer of care between the parties. He admitted that he had not signed the document prior to the incident.

---

[6] Emergency room nurses must act reasonably to prevent injury to others, and emergency room nurses must use good communication to prevent injury to others.

19

Although he admitted in his deposition that care had not been transferred at the time of the incident, he stated at trial, "I don't understand what you're asking." When asked if he was required to sign the document, he responded, "There is no reason not to [sign it]."

Nevertheless, Nurse Harless claimed that despite the formal transfer of care as represented by the signed document, BMH and EMTs share jointly in the patient's care from the time BMH learns of the patient's impending arrival. He agreed, however, that EMTs retain the greatest responsibility until the emergency room personnel finish assessing and triaging the patient. As to whether EMTs remain in charge of the patient as long as he/she is on their stretcher, Nurse Harless claimed that he was confused regarding the meaning of "in charge." He then admitted that EMTs, "have the most liability to that patient, yes." However, when deposed, he stated, "Sure, I mean, he was in charge of that patient until [he] was off of their stretcher." When reminded of his testimony, Nurse Harless agreed that the patient was the EMTs' patient as long as he was on their stretcher. He later qualified this statement by stating that he did not "wholeheartedly agree with that[]" because of the shared responsibility BMH and EMTs have for the patient. However, the following colloquy occurred under cross examination:

> Q. So, Mr. Harless, to ask you again. Have you admitted to me that the EMTs were in charge of the patient on that stretcher until the patient is off that stretcher? Is that something you have admitted to me?
>
> A. Yes. I said that the EMTs are in charge of the patient as primary provider for that patient.
>
> Q. And when you admitted that to me in your deposition, which was taken in 2017; you didn't give me [any] further explanation; correct?
>
> A. I guess in the context of what was in I didn't offer that.
>
> Q. Okay, correct. So you've had some time to think about?

A.    Have I had time to think about –

Q.    Yeah.

A.    What I said in 2017?

Q.    You've now added some explanation to it over – close to over four years later.

A.    I've thought about it, yes.

Q.    Yeah, and that includes after meeting and speaking with your attorneys; correct?

A.    Well sure, it came up.

Nurse Harless testified that he thought room six was ready to receive the patient when he directed the EMTs to that room as he had already wiped down the stretcher and the sink and door handles. He admitted that he did not check the floor and that Plaintiff's partner refused to transfer the patient to the emergency-room bed when he noticed a liquid or biohazardous substance on the floor. He then told the EMTs to move the stretcher back into the hallway, where he triaged the patient while they waited for the room to be cleaned. He claimed there was nothing wrong with his preparation of the room. When asked if he had cleaned the floor, he stated, "No, the floors are a filthy place. I do not clean floors, if we need floors clean[ed] then we will call housekeeping." While Nurse Harless agreed that a room is not ready for a patient if a substance is found on the floor, he asserted that room six was ready for the patient and that the EMTs could have transferred the patient to the emergency-room bed without a problem. However, in his deposition he said that the room was ready for the patient after housekeeping cleaned the room.

Haleigh Smith, a registered nurse, testified as BMH's corporate representative. She was BMH's director of emergency services from 2017–2020, and she was an emergency room nurse prior to and subsequent to her stint as the emergency services director. Nurse Smith was knowledgeable about the transfer of

21

care and safety policies applicable to BMH's emergency room. She admitted that EMTs remain the patient's primary caregiver until he/she is transferred to the emergency room bed and documentation accepting the care of the patient is signed by emergency room personnel. However, when asked if this was BMH's policy, she stated, "I don't remember a policy." She said that although EMTs are the patient's primary caregiver, BMH is also a caregiver. Nurse Smith further denied that EMTs maintain control over the patient while he/she is on their stretcher. She stated that the patient is "primarily their patient, but we are – it's our responsibility to take care of the patient once they are on [BMH's] premises." She claimed that EMTs are relieved of their responsibility for the patient when they reach the emergency room, no matter whose stretcher the patient is on.

Nurse Smith admitted that the EMTs had not yet transferred the care of the patient to BMH at the time of the incident. Despite stating in her deposition that the patient was not in critical condition since he was not receiving life-sustaining treatment, she testified that she could not tell from the video whether the patient required urgent care. While she agreed that the EMTs received no assistance from emergency room personnel prior to the incident, she claimed that Nurse Harless's stoppage of the stretcher qualified as assistance.

Regarding whether Nurse Harless's act was appropriate, the following colloquy occurred between Nurse Smith and Plaintiff's counsel:

Q.   [W]ould you agree that you wouldn't want a moving stretcher to suddenly decelerate while somebody is pulling it with their outstretched arm?

A.   I can't say.

Q.   One way or the other?

A.   One way or the other. It depends on the circumstances.

22

Q. Would you agree that you wouldn't want a moving stretcher to stop while somebody is pulling it with an outstretched arm?

A. It depends on the circumstances.

Q. Would you agree that you shouldn't try to redirect a moving stretcher while somebody is pulling it with their outstretched arm?

A. Again, it would depend on the circumstances.

Q. Wouldn't you agree that if you did want to try to redirect a moving stretcher while somebody is pulling it with their outstretched arm, you should probably warn that person or give them some sort of heads up?

A. Depending on the circumstances.

Q. Going back to the surveillance. Ms. Smith, you would agree that there was no reason that Nurse Harless needed to provide any sort of life sustaining care to this patient; correct?

A. I can't say because I wasn't there at that time.

Q. Ms. Smith, if a room in the emergency room department needs to be cleaned, staff is not allowed to bring a patient into that room until it's clean; correct?

A. Not allowed? I would say depending on the situation, I mean –

Q. Let's talk about this situation. If room six needed to be cleaned, if a particular room needed to be cleaned, David Harless, he shouldn't have tried to bring a patient in that room in that situation; correct?

A. Unless he thought it was clean.

Q. But it's also the ER staff –

A. If he had known then yes, he shouldn't have brought them in there if he would have known it wasn't clean.

Q. It's everybody's responsibility in the ER department to ensure that rooms are clean before they try to bring a patient in there; correct?

A. To the best of our ability.

Q. But he should have checked to see if it was clean before trying to bring the patient into that room; is that fair?

23

A.    He could have looked, but I'm not sure if he did or not.

Anita Thibodeaux, BMH's chief nursing officer in 2016, was not familiar with the safety rules requiring an emergency room nurse to act reasonably and to communicate effectively.  She had never seen "something that would be a must or an always or along that route, no I have not."  As to whether she agreed with rules, the following colloquy occurred:

A.    Can you give me what you mean by reasonably?

Q.    . . . Is it ever okay to act unreasonably in an emergency room?

A.    What would you consider reasonable or unreasonable?

Q.    . . . Is it ever okay to not use good communication in an emergency room?

A.    And again, I'm not really understanding.  In order for me to say yes, I agreed, I can't say that to these.

Q.    Yes, ma'am.

A.    Things depend on the circumstances and what would be considered reasonable and the must and the good communication, I'd have to have a definition of that.

Q.    Yes, ma'am.  Would you agree that the staff at [BMH] should communicate well with the EMTs who are bringing patients into the emergency room?

A.    I would hope that people would be able to understand what other people are saying, but again, I'm not sure what you mean by communicate well.

Q.    Do you think they should talk to each other?

A.    Usually they do talk to each other, sometimes they don't.  It all depends on the circumstances.

Q.    Well, when they are transferring a patient; how about in that situation?  Should they talk to each other?

A.    And again, it depends on the situation.  Sometimes things are in such an emergency nature there is not time for talking.

Q.    Okay.  So, in an emergency situation, how about in a situation that isn't an emergency situation[?]

24

A.   And again, it would depend on the situation.

Business Health's medical records indicate that Plaintiff was seen on four occasions beginning on June 25, 2016, the night of the incident. The remaining three appointments occurred on July 1, 8, and 15, 2016. Plaintiff was initially diagnosed with right shoulder pain and placed on light-duty work through July 15, 2016. Her diagnosis changed to right arm pain, triceps strain on July 1, 2016, and then to right triceps and upper arm strain on July 8, 2016. During this time, she was instructed to treat her arm/shoulder with rest, ice, compression, elevation, and anti-inflammatories. By July 15, 2016, Plaintiff, who was no longer in pain and had regained full strength and range of motion in her shoulder, was released to return to work with no restrictions.

Hunter McGuire's medical records indicate that Plaintiff was first seen on August 25, 2016, complaining of "Rt tricep injury on 6/25/16[.] Has returned to work – Arm still hurts[.] [Increased] pain especially w/ heavy lifting. Works as an EMT[.]" She was restricted to light-duty work, with no lifting of over five pounds, pending a follow-up with an orthopedic surgeon. On September 23, 2016, the medical record notes, "Follow up – Rt Arm Strain[.] W.C. not responding to req for ortho per patient[.]" Plaintiff was again restricted from working through October 10, 2016, and ordered to follow up with an orthopedic surgeon.

Regarding the issue of special damages, the parties stipulated that the medical expenses related to Plaintiff's injury amounted to $42,626.58. Plaintiff further introduced her 2014, 2015, and 2016 W-2s, which listed her earnings for those years as $27,914.85, $29,957.47, and $23,052.48, respectively.

*Negligence:  Duty and Breach of Duty Elements*

We first turn to BMH's argument that the jury erred in finding Nurse Harless negligent. This addresses the first two prongs of the duty-risk analysis necessary to

25

establish negligence and liability therefore, whether he had a duty to conform his conduct to a specific standard and whether he breached that duty. *Jones v. Centerpoint Energy Entex*, 66 So.3d 539.

The initial inquiry in a negligence action is whether the defendant owed the plaintiff a duty. *Posecai v. Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99), 752 So.2d 762. Absent a specific statutory or jurisprudential duty, a defendant is required "to use reasonable care so as to avoid injury to another." *Boykin v. La. Transit Co.*, 96-1932, p. 10 (La. 3/4/98), 707 So.2d 1225, 1231.

> A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." **Morris v. Orleans Parish School Bd.**, 553 So.2d 427, 429 (La. 1989) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 53 at 356 (5th ed.1984)). Whether a duty is owed presents a question of law. **Posecai**, 99-1222 at 4, 752 So.2d at 766. The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty. **Faucheaux v. Terrebonne Consol. Government**, 615 So.2d 289, 292 (La. 1993). Duty presents a legal question subject to *de novo* review on appeal. See **Ferrell v. Fireman's Fund Insurance Co.**, 94-1252, p. 7 (La. 2/20/95), 650 So.2d 742, 747.

*Malta v. Herbert S. Hiller Corp.*, 21-209, pp. 11-12 (La. 10/10/21), 333 So.3d 384, 395.

As no specific statutory or jurisprudential duty was pointed out by Plaintiff, any duty owed by Nurse Harless to Plaintiff arises under the general principles of fault.

> Generally, there is an almost universal legal duty on the part of a defendant in a negligence case to conform to the standard of conduct of a reasonable person in like circumstances. *Joseph v. Dickerson*, 99-1046 (La.1/19/00), 754 So.2d 912, 916; *Boykin v. Louisiana Transit Co.*, 96-1932 (La.3/4/98), 707 So.2d 1225, 1231. Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties. *Socorro v. City of New Orleans*, 579 So.2d 931, 938 (La.1991

*Davis v. Witt*, 02-1119, p. 13 (La. 7/2/03), 851 So.2d 1119, 1128.

26

Thus, under the facts at issue, we find that Nurse Harless had a duty to exercise reasonable care in the performance of his emergency room duties in order to avoid causing injury to others, including to EMTs acting in the performance of their duties.

Whether Nurse Harless breached the afore-stated duty is a question of fact to be determined by the factfinder, in this instance, the jury. *Hanks v. Entergy Corp.*, 06-477 (La. 12/18/06), 944 So.2d 564. On appeal, the reviewing court will not reverse a jury's findings of fact absent a finding of manifest error:

> A reviewing court may not set aside a [jury's] finding of fact in the absence of manifest error or unless it is clearly wrong, and where there is conflict in the testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Stobart v. State, Though DOTD*, 617 So.2d 880, 882 (La.1993). In order to reverse a district court's determination of a fact, a reviewing court must review the record in its entirety and (1) find a reasonable factual basis does not exist for the finding, and (2) further determine the record establishes the factfinder is clearly wrong or manifestly erroneous. *Bonin [v. Ferrellgas, Inc.]*, 03-3024 at p. 6-7 [(La. 7/2/04)], 877 So.2d [89,] 94-95; *Stobart*, 617 So.2d at 882. "To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support." *Perkins v. Entergy Corp.*, 00-1372, p. 11 (La.3/23/01), 782 So.2d 606, 613; *Benjamin [ex rel. Benjamin v. Housing Authority of New Orleans]*, 04-1058 at p. 7 [(La. 12/1/04)], 893 So.2d [1,] 6; *Bonin*, 03-3024 at p. 7, 877 So.2d at 95. Nevertheless, the issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Stobart*, 617 So.2d at 882.

> If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *Carter v. Haygood*, 04-0646, p. 9 (La.1/19/05), 892 So.2d 1261, 1267; *Stobart*, 617 So.2d at 882. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Bonin*, 03-3024 at p. 7, 877 So.2d at 95; *Rosell*, 549 So.2d at 844. When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Bonin*, 03-3024 at p. 7, 877 So.2d at 95; *Rosell*, 549 So.2d at 844.

27

*Id.* at 580.

After reviewing the record in its entirety, we find that the jury was presented with conflicting views of the evidence on the issue of whether Nurse Harless breached his duty to exercise reasonable care in the furtherance of his duties as an emergency room nurse. Nurse Harless admitted that he knew the patient was being transported to BMH. He further acknowledged that he volunteered to prepare the only room available for the patient. Of critical importance in this matter are the three video clips introduced into evidence by Plaintiff. The first clip commences just after the EMTs enter the emergency room with the stretcher and concludes as they exit the emergency room. The second clip shows a different view of the EMTs exiting the emergency room. The third clip, set in the ambulance bay, commences as the EMTs exit the emergency room and concludes when their ambulance leaves the ambulance bay.

Based on the video, Nurse Harless saw the EMTs walking towards him with the stretcher as he was getting linen from a blanket warmer located in the hallway. Instead of communicating the room assignment when he first saw them, he waited until Plaintiff had taken approximately twelve steps and the stretcher had passed him before grabbing the rear of the stretcher and pulling it to a stop.

Plaintiff admitted that someone asked them where they were going with the stretcher, as evidenced by her pointing towards the nurse's station with her left arm. However, Plaintiff's response to this question occurred as she was walking past Nurse Harless. Although the video contains no audio of the incident, this is the first indication that Nurse Harless, the only emergency room personnel shown in the video, communicated with the EMTs. The next indication of communication occurred when he walked behind the stretcher, stopped it, and glanced towards the EMTs as he gestured towards room six with his right hand.

28

Based on our review of the video, Nurse Harless could easily have communicated with the EMTs as they walked towards him as the only other person in the hallway at the time was a visitor, who quickly walked around the corner and out of view of the camera. Moreover, by the time the stretcher passed in front of Nurse Harless, he was so close to the EMTs that he nearly brushed shoulders with both of them as he moved towards the rear of the stretcher. Despite his testimony to the contrary, it is obvious from the video that the stretcher was stopped by Nurse Harless. This is plainly evident from watching the stretcher's front wheels before and after it stopped. While the EMTs were rolling the stretcher down the hallway, its wheels were aligned in the direction it was moving. When Nurse Harless grabbed the stretcher, the wheels immediately rotated sideways, evidencing that he had stopped it in its tracks. This is further evidenced by the lowering of Nurse Harless's head and shoulder as he applied the necessary force to the rear of the stretcher to counteract its forward motion.

It is further undisputed that the incident at issue occurred prior to the EMTs' transfer of the patient's care to BMH, as borne out by the fact that shortly after the patient was wheeled into room six, he was wheeled back out into the hallway while still on the EMTs' stretcher. Despite the equivocal, evasive testimony provided by Nurse Harless, Nurse Smith, and Nurse Thibodeaux on the issue of transfer of care, all agreed that the EMTs remained the patient's primary caregiver while he was on their stretcher. Further, Dr. Cascio's testimony supports the jury's determination that Nurse Harless, while acting in the course of his employment for BMH, was in fact negligent. Thus, we find no manifest error in the jury's determination that Nurse Harless acted negligently regarding this incident.

29

## Cause-in-fact and Legal Cause Elements

It is respecting these two elements of the duty-risk analysis that BMH claims the trial court erred in granting the JNOV: Whether Plaintiff was injured and whether Nurse Harless's conduct was the cause-in-fact and legal cause of her injury. *Jones*, 66 So.3d 539. As reflected previously, our inquiry is whether the facts and inferences point so strongly and overwhelmingly in favor of Plaintiff, as the moving party, that reasonable jurors could not arrive at a contrary verdict. *Joseph*, 772 So.2d 94. If this question is answered in the affirmative, the trial court was correct in granting the JNOV. But, if we find that reasonable jurors could arrive at a contrary verdict, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. *Id.*

Regarding the cause-in-fact element, this court, in *Fontenot v. UV Insurance Risk Retention Group, Inc.*, 20-361, 20-362, pp. 8–9 (La.App. 3 Cir. 4/14/21), 359 So.3d 36, 45, *writ denied*, 21-656 (La. 10/5/21), 325 So.3d 357, has stated:

> The plaintiff bears the burden of proving a causal relationship between the injury and the accident which caused the injury. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615 (La. 2/20/95), 650 So.2d 757. The burden of proof is by a preponderance of the evidence. *Id.* The test for determining the causal relationship is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Id.*
>
> In order to obtain the benefit of the presumption of causation described in *Housley v. Cerise*, 579 So.2d 973 (La.1991), the plaintiff must show that (1) he was in good health prior to the accident at issue; (2) following the accident, symptoms of the alleged injury appeared and continuously manifested themselves afterward; and (3) through evidence, whether medical, circumstantial or common knowledge, a reasonable possibility of causation between presumption of causation and the burden of proof shifts to the defendant to prove some other particular incident could have caused the injury of which the plaintiff complains. The presumption is rebuttable upon a showing by the defendant that some other particular incident could have caused the injury in question. *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So.2d 557.

30

As to legal cause, the supreme court, in *Rando v. Anco Insulations Inc.*, 08-1163, pp. 30-31 (La. 5/22/09), 16 So.3d 1065, 1088, explained:

> "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." *Roberts v. Benoit*, 605 So.2d 1032, 1044 (La.1991). "The scope of protection inquiry asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.' " *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289, 293 (La.1993). Although we have unequivocally stated "the determination of legal cause involves a purely legal question," *Todd v. State, Dept. of Social Services*, 96-3090 (La.9/9/97), 699 So.2d 35, 39, this legal determination depends on factual determinations of foreseeability and ease of association. *See Perkins v. Entergy Corp.*, 98-2081 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 410, *affirmed*, 00-1372 (La.3/23/01), 782 So.2d 606.

It further stated:

> A risk may not be within the scope of a duty where the circumstances of the particular injury to the plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between that risk and the legal duty. *Todd v. State Through Social Services*, 96-3090 (La.9/9/97), 699 So.2d 35; *Hill v. Lundin & Associates, Inc.*, 260 La. 542, 256 So.2d 620 (1972). The extent of protection owed by a defendant to a plaintiff is made on a case-by-case basis to avoid making a defendant an insurer of all persons against all harms. *Todd*, 699 So.2d at 39.

*Id.* at 1092-93.

Notwithstanding its initial finding that Nurse Harless was negligent, the jury subsequently found that his negligence was not the cause-in-fact and legal cause of Plaintiff's injury. Despite this finding, the jury heard uncontradicted testimony that Plaintiff was in good health prior to this incident, but that commiserate with it she experienced an immediate onset of shoulder pain as evidenced by the video of the incident. Within less than a minute of Nurse Harless stopping the stretcher, the video showed Plaintiff wiping her eyes and guarding her right arm as though it was in a sling. The video further showed that other than using both arms immediately after the incident to move the stretcher from the middle of the hallway, Plaintiff

31

subsequently used only her left arm when moving the stretcher until the time she and her partner left the emergency room. Within approximately thirty seconds of the incident, the video showed Plaintiff's partner gesture towards his right shoulder and stretch out his arm behind him while talking to her. After exiting the hospital, it showed Plaintiff guarding her arm and then raising her arm as if checking her range of motion. It further showed her partner put his hand on her right shoulder and then grab and jerk the back of the stretcher as though demonstrating how it was stopped.

The jury also heard uncontroverted evidence that Plaintiff's symptoms persisted continuously from the date of the incident as evidenced by her medical records. Although she was released to full duty by Business Health after resting her shoulder for three weeks, Hunter McGuire's records indicate that her pain returned as soon as she returned to work, especially with heavy lifting. Moreover, had Plaintiff suffered a new injury to her right shoulder, as claimed by BMH, Acadian Ambulance would have required her to report the injury, provide a urine sample, and complete an incident report. The jury further heard the uncontradicted testimony of Dr. Cascio that based on the video footage, as corroborated by the incident statement and medical histories related by Plaintiff, it was more likely than not that this incident caused her torn labrum. "[O]ur law is clear that 'as the finder of fact, a court cannot speculate as to the vague possibilities for causation, when medical witnesses have established an event as to the probable cause of injury.'" *Delco v. State Farm Mut. Auto. Ins. Co.*, 20-592, p. 8 (La.App. 3 Cir. 8/11/21), 329 So.3d 339, 345 (quoting *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615, p. 7 (La. 2/20/95), 650 So.2d 757, 762). As Dr. Cascio's uncontradicted medical testimony established that Plaintiff's shoulder injury was caused by the incident in question, it was speculative for the jury to find that her injury was caused by some

32

other incident, especially as the record was devoid of any evidence establishing that another incident was the cause of her injury.

Based on the foregoing evidence, we find that Plaintiff was entitled to the benefit of the *Housley* presumption on the issue of causation and that BMH failed to rebut the presumption by establishing that she was not injured as a result of the incident or that her injury was caused by another incident. Thus, we find that the jury was manifestly erroneous in finding that this incident was not the cause-in-fact and legal cause of her shoulder injury.

As to the trial court's grant of the JNOV, we find that the facts and inferences established by the evidence point so strongly and overwhelmingly in favor of finding that Plaintiff's shoulder injury was caused by this incident that no reasonable juror could conclude otherwise. BMH failed to present any evidence contradicting the overwhelming evidence presented by Plaintiff that the abrupt, unexpected stoppage of the stretcher by Nurse Harless injured her shoulder, which as attested to by Dr. Cascio and shown by the video was vulnerable to injury as her arm was stretched out behind her while she pulled the approximately 300-pound stretcher. The jury was not asked to decide if Nurse Harless' actions caused a labral tear, only whether his actions caused injury. No reasonable person could conclude that Plaintiff was not injured. Her testimony clearly reflects that she suffered an immediate onset of pain following the incident, as corroborated by the video and Business Health's medical records. Dr. Cascio's opinion was clear and uncontradicted that Plaintiff was injured as a result of the incident and that all of the treatment she subsequently received was related to the injury caused by the incident. All of this, even absent the *Housley* presumption, shows the unreasonableness of the jury's conclusion as to injury and causation. The application of the *Housley* presumption, in addition to the

33

uncontroverted evidence, leaves absolutely no doubt that Plaintiff's injury was caused by this incident.

We further find no merit in BMH's argument that the trial court, in granting the JNOV, improperly substituted its own assessment of the credibility of the lay and expert witnesses in place of the jury's assessment. As reflected above, the evidence that Plaintiff's shoulder injury was caused by this incident was largely uncontested; thus, there was no need for the trial court to weigh the testimony or evidence presented. No witness for BMH could say that Plaintiff was not injured, and her actions depicted on the video clearly show that she experienced an immediate onset of pain in her right shoulder, which she continued to demonstrate throughout the duration of the video clips. Even Nurse Harless admitted that he learned about Plaintiff's injury from her partner, that he saw her holding her arm, and that he even asked her if she needed to see the doctor. Moreover, BMH stipulated to the accuracy of $42,626.58 in medical expenses related to Plaintiff's injury.

Based on the foregoing, we find that the trial court was correct in granting the JNOV in favor of Plaintiff on the issue of causation. Having set aside the jury verdict, the trial court then became the trier of fact as to the damages sustained by Plaintiff as a result of Nurse Harless's negligence. *Anderson*, 583 So.2d 832.

### Damages

The damages awarded under La.Civ.Code art. 2315 are compensatory in nature and are intended to compensate the tort victim by returning her to the condition she enjoyed prior to the act of negligence causing her injuries. *McGee v. A C & S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770. Compensatory damages consist of special and general damages. "Special damages are those which have a 'ready market value,' such that the amount of damages theoretically may be

34

determined with relative certainty, including medical expenses and lost wages." *Guillory v. Lee*, 09-75, p. 16 (La. 6/26/09), 16 So.3d 1104, 1117. General damages, on the other hand, are "those which may not be fixed with any pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot really be definitively measured in monetary terms.'" *Duncan v. Kansas City S. Ry, Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682 (quoting *Keeth v. Dep't of Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La.App. 2 Cir. 1993)).

After granting the JNOV on the issue of causation, the trial court awarded Plaintiff $42,626.48 in past medical expenses, $60,000.00 in past lost wages; and $261,000.00 in general damages. We will address each category of damages separately.

## Special Damages

In reviewing an award of special damages, the appellate court "must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong." *Id.* at 1118.

### Past Medical Expenses

The parties stipulated prior to trial that the amount of past medical expenses related to Plaintiff's shoulder injury was $42,626.58. As this was the amount awarded for past medical expenses, the trial court was not manifestly erroneous in awarding that amount.

### Past Lost Wages

In awarding $60,000.00 in past lost wages, the trial court determined that Plaintiff's annual income was $30,000.00 based on her W-2s and the fact that but

35

for her injury, she would have earned in excess of $30,000.00 in 2016. It further held that although Plaintiff may have tried to work prior to her July 12, 2018 release by Dr. Cascio, "she could not work as she had previously for two years, between the day of her injury and the date of her release."

Following her June 25, 2016 injury, Plaintiff was restricted to light-duty work from June 25–July 15, 2016, and then again from August 5–September 23, 2016. However, because Acadian Ambulance could not accommodate this restriction, Plaintiff did not work during that time. She was totally restricted from working from October 6, 2016–July 12, 2018. Her W-2s established that she earned $27,914.85 in 2014, $29,957.47 in 2015, and $23,052.48 for the partial year she worked in 2016. According to Plaintiff, she was making $13.15 per hour when she was injured, and she estimated that she would earn $30,000.00 a year.

Based on the evidence presented, we cannot find that the trial court was manifestly erroneous in awarding $60,000.00 in lost wages to Plaintiff for the two years her shoulder injury prevented her from working.

## General Damages

The trial court awarded Plaintiff a total of $261,000.00 in general damages. The award consisted of $160,000.00 in past pain and suffering; $25,000.00 in future pain and suffering; $40,000.00 in past mental anguish; and $36,000.00 in loss of enjoyment of life.

The appellate standard of review for an award of general damages was laid out by this court in *Allison v. CITGO Petroleum Corp.*, 19-523, pp. 7–8 (La.App. 3 Cir. 12/18/19), 286 So.3d 1152, 1161 (alterations in original), as follows:

> General damages are reviewed for an abuse of discretion because the trial court "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. "The role of an appellate court in reviewing a general damages award is not to decide what it considers

36

to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Cormier v. Citgo Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir. 10/4/17), 228 So.3d 770, 776, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

"Mental anguish and grief refers to the 'pain, discomfort, inconvenience, anguish, and emotional trauma' that accompany the injury. *McGee* [*v. A C And S, Inc.*, 05-1036, (La. 7/10/06), 933 So.2d 770,] 775." *Rachal v. Brouillette*, 12-794, p. 5 (La.App. 3 Cir. 3/13/13), 111 So.3d 1137, 1142, *writ denied*, 13-690 (La. 5/3/13), 113 So.3d 217. Further, "[l]oss of enjoyment of life ... refers to the detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury." *McGee*, 933 So.2d at 775. "[W]hether or not loss of enjoyment of life is recoverable depends on the particular facts of the case, and should be left to the district court's discretion on a case-by-case analysis." *Id.* at 779. Additionally, in reviewing a general damage award, "a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively high, it may not be disturbed." *Pennison v. Carrol*, 14-1098, pp. 14-15 (La.App. 1 Cir. 4/24/15), 167 So.3d 1065, 1078, *writ denied*, 15-1214 (La. 9/25/15), 178 So.3d 568.

After reviewing the testimony and medical evidence presented and considering the damage award as a whole, we find that the trial court did not abuse its vast discretion in awarding Plaintiff $261,000.00 in general damages. Considering Plaintiff's young age at the time of her shoulder injury, her two-year recovery from surgery, her inability to return to her job as an EMT, and the effect her injury has had on her life in the forty-two months leading up to trial and onwards, we do not find that the $261,000.00 general damage award abusively high. Accordingly, we find no merit in this assignment of error.

*Assignment of Error Number Six*

In BMH's final assignment of error, it argues that the trial court erred by not applying the $500,000.00 statutory cap provided by La.R.S. 13:5106(B)(1) to the damages awarded to Plaintiff. However, during oral argument, counsel for BMH

acknowledged that this assignment of error was moot as the trial court's judgment was substantially less than the $500,000.00 statutory cap. Based on our affirmation of the amount of damages awarded to Plaintiff, we need not address this issue.

## DECREE

For the foregoing reasons, we affirm the jury's finding of negligence on the part of BMH through the actions of its employee. We further affirm the judgment of the trial court granting Ms. Rougeau's motion for JNOV and awarding her special and general damages in the amount of $363,626.48. Costs of this appeal are assessed to the defendants, Hospital Service District No. 2 of Beauregard Parish and West Louisiana Health Services, Inc. d/b/a Beauregard Memorial Hospital in the amount of $10,610.90. La.R.S. 13:5112(A).

**AFFIRMED.**